## LINDSAY v. KANSAS CITY, Appellant.

Division Two, March 29, 1906.

1. **STREET EXCAVATION:** Consent of City: Lights and Guards. A city is bound to keep its streets free from obstructions and dangerous holes and reasonably safe for travel in the ordinary modes; and where a hole was dug in the street, by the consent and authority of the city, for the purpose of connecting the water main with a house, and left unguarded by barricades, with no warning lights, the city is liable for injuries to persons, traveling in a carriage in the night, injured by the falling of the horses and carriage into the hole, if they were exercising ordinary care or were without contributory fault.

2. ———: **Lights and Guards: Conflict in Testimony.** Where there was positive testimony that there were no warning lights or barricades about the deep excavation in the street into which the carriage fell, and equally positive testimony that there was a light, it is for the jury to determine the issue, and their finding is binding on the court.

3. ———: **Contributory Negligence: Intoxication of Driver.** It is for the jury to say, where the evidence is conflicting, whether or not the driver of the carriage which fell into the excavated hole in the street, was intoxicated, or was, under the circumstances, guilty of contributory negligence in driving into the hole of which he had no knowledge.

4. **DAMAGES: Limited by Petition.** The petition alleged that, as a result of her injuries, plaintiff had lost her means of livelihood for the month preceding, amounting to $30, and will in the future be compelled to lose her means of livelihood, to her damage in the sum of $5,000. *Held,* that the court did not err in not limiting her damages as separately stated in the petition but properly gave an instruction which limited her damages because of the loss of her means of livelihood, past and future, as well as for all other injuries, to $5,000.

5. **EVIDENCE: Pains: Representations.** Complaints and representations of suffering made by the injured party to any one are not rejected as mere opinion or as *non res gestae.* So that it was not error to permit a witness to testify that plaintiff "complains of pains in her back."

6. ——: **Observation.** Observation by a witness of how much work plaintiff has been able to do since the accident, is not to be rejected. It is not mere conclusion or opinion, even though stated thus: "Very little; she has not worked at all, I do not think, since the accident."

7. **EXCESSIVE VERDICT: Jury's Province: $5,000.** In each case whether the verdict is the result of passion or prejudice or mistake or is but a fair compensation for the injuries received, must depend largely upon the facts. The plaintiff, a young woman, in excellent health, dependent entirely upon her own labor, had been earning $12 a week as a linotype operator. By the fall her elbow was dislocated, and that injury, in the opinion of the experts, is permanent; she was knocked senseless and received many bruises and contusions on her head and body; she was compelled to give up another good position, because of her inability to work; she had lost from 30 to 40 pounds in flesh, and at the time of the trial, 18 months after the accident, still suffered great pain in her back and head,

due to the fall. *Held,* that it was the province of the jury to assess her damages, and, under the circumstances, it cannot be said that a verdict of $5,000 should be set aside.

Appeal from Lafayette Circuit Court.—*Hon. Samuel Davis,* Judge.

AFFIRMED.

*Edwin C. Meservey* and *Francis M. Hayward* for appellant.

(1) The verdict of the jury is not only not supported by evidence, but is directly contrary to the evidence and cannot stand. Reman v. Boston Trading Co., 87 Mo. App. 186; Kreis v. Railroad, 30 S. W. 310; Lawson v. Mills, 130 Mo. 170. (2) The damages assessed by the jury are excessive for the injury plaintiff sustained. Thomas v. Consolidated Traction Co., 62 N. J. L. 36; Ryder v. Mayor, 50 N. Y. Super. 220; Railroad v. Anderson, 80 Ill. App. 71. (3) The first instruction asked by plaintiff as to damages is clearly erroneous, as not limited by the allegations of the petition. 2 Thompson on Trials, sec. 2309; Brown v. Railroad, 78 Mo. 504; Duke v. Railroad, 99 Mo. 347; Waddingham v. Hulett, 92 Mo. 528; Lester v. Railroad, 60 Mo. 265. (4) The court erred in admitting incompetent evidence on the part of the plaintiff, same being only opinion evidence and hearsay, which was prejudicial error. Sparr v. Wellman, 11 Mo. 230; Wetherell v. Patterson, 31 Mo. 458.

*Ralph S. Latshaw* and *John S. Blackwell & Son* for respondent.

(1) "Was the hole at the time of the accident guarded with lights or barricades?" This is, indeed, a vital question; but a question where there was reliable, abundant, and indeed, overwhelming and indispu-

table testimony by eight disinterested witnesses, that
there were no danger signals, lights or barricades about
the hole where plaintiff was injured shortly before and
at the time that the carriage in which plaintiff was
riding was thrown against and into said hole, thereby
injuring plaintiff.    (2)   In appellant's motion for a
new trial no particular instruction given by the trial
court at the instance of respondent, is complained of;
said motion for a new trial says:  "7.  The court erred
in giving the instruction to the jury at the instance of
plaintiff."   However, the instruction set out in appel-
lant's argument is in nowise subject to the construction
that appellant would place upon it.   (3)   In the case of
Reynolds v. Railroad, 88 S. W. 52, an instruction much
broader as to measure of damages was approved by
this court, citing:  Rodney v. Railroad, 127 Mo. 676;
O'Connell v. Railroad, 106 Mo. 484; Duerst v. Stamp-
ing Co., 163 Mo. 617.

GANTT, J.—On the 27th of September, 1901, the
plaintiff, Miss Clara Lindsay, commenced action for
damages for personal injuries against Kansas City. In
her petition she alleges that Kansas City is a municipal
corporation organized under a freeholders' charter,
and that Southwest boulevard is one of the streets in
said city, used by the general public for the purpose
of travel.   It is then alleged that prior to and on the
13th day of July, 1901, the said city carelessly and neg-
ligently failed and neglected to place and maintain bar-
riers, lights or other warnings at or near a hole in said
Southwest boulevard to warn persons lawfully using
said street, of said hole and said defects and dangers.
It is then alleged that on the night of July 13, 1901, at
about 10:30 o'clock, plaintiff was lawfully riding in a
carriage in a southwesterly direction between Twenty-
eighth and Twenty-ninth streets, and the carriage in
which plaintiff was riding  ran against and into said
hole in said street and was overturned, and plaintiff

precipitated therefrom with great force and violence onto the pavement, and her right elbow dislocated and her shoulder bruised and sprained and her neck and back and spinal column wrenched and strained, and plaintiff was injured in her internal organs; that on account of her injuries, she has been compelled to obligate herself for large sums of money for doctors and surgeons and nurse hire, and will as long as she lives be compelled to obligate herself for large sums of money, to-wit, $300; that on account of said injuries plaintiff has suffered, and will, so long as she lives, suffer great physical pain and mental anguish, and on account of said injuries was compelled to lose her means of livelihood for the month following said 13th day of July, 1901, to her damage in the sum of $30, and will in the future be compelled to lose her means of livelihood to her damage in the sum of five thousand dollars.

The answer was a general denial and a plea of contributory negligence on the part of the plaintiff and on the part of the driver who was in charge of the carriage at the time plaintiff was hurt.

A change of venue was awarded to the Lafayette Circuit Court. In that court the cause was tried to the court and a jury, and resulted in a verdict of five thousand dollars. In due time motions for new trial and in arrest were filed, heard and overruled, and the defendant appealed to this court. On the trial the testimony tended to establish the following facts:

The plaintiff was a single lady about thirty years of age, and had for six years previous to the injuries of which she complains been working constantly at her trade of linotype operator, earning twelve dollars a week. On the night of July 13, 1901, she and her landlady, with whom she was boarding, and two gentlemen friends, started in an open hack about 8:35 o'clock, to take a drive; they stopped at the corner of Fifth and Delaware streets in Kansas City and got two bottles of

beer, and then drove to the corner of Ninth and Broadway, where they took in another gentleman, and then drove down Broadway and thence along the Southwest boulevard until they reached a point about half way between Twenty-eighth and Twenty-ninth streets where, as the evidence tends to show, there was an excavation dug in the street by a plumber to connect the building of a Mr. Hummer with the watermain in the street. The work was being done for Mr. Cotter, a plumber in the city. The plumber's workmen had been engaged for nearly a week in excavating the trench to make the water connection. Southwest boulevard was paved with asphalt, and this hole was cut across the driveway and was about six feet wide and between seven and eight or ten feet long and about six feet deep. The dirt from this hole was thrown on one side and the rock on the other. The great controversy in the case arose over the question whether this hole or excavation in the street was lighted with lamps or lanterns that night so as to apprise the drivers of vehicles along the boulevard of the presence of this hole. The evidence on the part of the plaintiff was to the effect that there were neither danger signals nor lights or any kind of barricades or ropes to warn the traveling public of the danger.

Mr. C. O. Shepard testified that he was a clerk in the store of Emery, Bird & Thayer, and on the evening of the accident, about 8 o'clock, he passed along Southwest boulevard in a street car, and by this excavation, and noticed the hole as he passed by, and he was sitting next to the window, and the window was open; there were no lights or barricades about the hole when he passed there.

Mrs. Furnkas who was in the carriage with plaintiff when the injury occurred, testified there were no lights or barricades about the hole into which the hack and horses fell. She testified that immediately after the hack fell into the hole, the parties there looked around and there was no sign of lights or barricades;

that she was there before the firemen came to take the horses out of the hole.

Mr. Woodcock, witness for the plaintiff, testified that he was in the barber shop about 150 feet from the hole in the ground, on the night of the accident, and some persons came into the shop and called for a light saying there had been an accident there at the hole; that he took one of the bracket lamps off of the wall of the barber shop, and carried it over where the hole was, and there was a horse down in there. He described the hole as about five or six feet wide and ten and a half feet long and about ten feet deep; he supposed the hole had been there for possibly a week before the night of the accident. Asked if there were any lights or barricades there that evening, he said he could not say, he did not notice any, but there were none there when he went over with the light from his shop; "there was not any lights there is the reason they came over for a light at his shop."

Obed Reeve testified that he passed this hole at about 7:30 o'clock or a little later, that night, and there was no light there then.

Don E. Leland who was in the carriage at the time the plaintiff was injured, testified that it was very dark, there was nothing there to show that there was an excavation in the street, no lights, no barricades and no danger signals of any kind.

Harry Crowder, another of the passengers in the hack, testified there was no lamp or light or barricades about the hole, until some one after the accident brought a light from across the street.

The driver, Frank Costello, testified it was a very dark night, and that he did not notice any hole or any lights or barricades to warn him as he was driving along the boulevard, and when he got within a very few feet of it, it looked like water and mud in the street, and the first thing he knew, his team was up on the embankment and fell over in the ditch. He was driving

along in what you would call a dog-trot; he saw neither lights nor danger signals about the hole, and there were none there.

On the part of the city, Mrs. Hummer, whose husband had employed Mr. Cotter, the plumber, to dig the trench, testified that she saw a lamp lighted and on the place about six o'clock that evening; she lived at 2823 Southwest boulevard; she testified that the lantern used for a signal light was kept in her husband's store building; that when she went to bed about 9:30 o'clock as near as she could remember, it was still burning.

Mr. Cotter testified that he was the contractor having this hole dug at that time; that he went to this excavation on the night of the accident about 10:30 o'clock. He was asked to state just what the condition was. He answered, "Well, we are supposed to put a red light out." Q. "Well, what was the condition at 10:30 o'clock that night?" A. "It was barricaded and lighted, the light was on top of the dirt and the lamp was attached to a pipe stuck down in the ground; I examined the lamp and there was plenty of oil in it." On cross-examination he stated "that if he left a hole unbarricaded in the street, he was responsible for any damage that occurred on account of its not being lighted or barricaded; that he was altogether interested."

Leo Shay also testified in behalf of the defendant. He states that he was working for Mr. Cotter the plumber, and heard of this accident the next day after it occurred; that he was out there about 10 o'clock the night of the accident, and the hole was barricaded on all sides and a lantern on a piece of pipe in the dirt, and boards on the next side to the curbing. His description of the hole, however, is radically different from that of the other witnesses. He states also that he worked on that hole about two weeks before the accident.

Mr. E. V. Starr testified that he was the foreman of the Armour Packing Company. He remembered the incident of the carriage falling into the hole on South-

west boulevard on the 13th of July, 1901. He had seen the excavation that evening. When the accident happened he was sitting in a barber shop about 150 feet from the hole. He testified that he saw a light before the accident; he went down to the hole after the accident occurred, and found one of the horses in the hole. A lot of city firemen came down to get the horses out of the hole; he testified that the hackman was intoxicated; he could not recognize the plaintiff as the lady who was in the hack at the time. On cross-examination he stated that he did not think anyone came over from the barber shop. Asked if he saw the hack driver there, he answered, "Yes, sir." Q. "Did he have the appearance of having drunk anything?" he answered, "No, sir, I could not see."

Mr. N. P. Miller also testified in behalf of the city. He lived at 2827 Southwest boulevard. He heard of the accident shortly after it happened. He was about eight lots further southwest from the place. He testified that he had seen a red light at this excavation every night for a week or ten days; he could not say positively that on the night the accident happened he saw the red light, he was too busy; he went over after the accident, and thinks he saw the harness and lantern lying in the dirt and that one of the horses was down in the hole. On cross-examination he stated he was not sure he saw the lantern, but thinks he saw a red lantern lying there. He thinks the hole was about five feet square, may be five to six feet deep; the hole ran about four feet of the car track over to the sidewalk. The hole ran up within a foot and a half of the car track; no one could drive a wagon between the end of the hole and the car track and there was not room enough for a vehicle to pass between the curbstone and the hole. He could not say that he saw any light there that night.

Mr. Sullivan, a member of the police department, testified that he was on duty the night of the accident on Southwest boulevard; he was three or four blocks

away when it happened; he had passed the place where the accident occurred about twenty minutes before it happened; there was a light there, a lamp on a stick sitting on the side of the bank of dirt that had been thrown out of the hole on the north side; when he came back the firemen were trying to get the horses out of the hole and he dug up a frame of a lantern that had been run over; he gave the lantern to the foreman of No. 9 Fire Company; the dirt was about three and a quarter to four feet high on the side of the excavation. I judge it was about that. He saw the plaintiff at the doctor's office and had a conversation with her after the accident; he asked her name and she refused to tell him; she said, ''You need not be afraid of a suit against the city, we do not want our names in the paper.'' He knew the driver, Frank Costello, and he was drunk, drunk enough to stagger around. There were no boards on the sides of the excavation.

Mr. McVay, another witness for the city, testified that he was at the place of the accident a few minutes after it happened; his place of business was about one hundred feet north, across the street; he could not state that there were lights at the place before the accident happened. There was no light there at seven o'clock that evening; he thought the driver was very indifferent in getting his horses out of the hole, he acted as though ''he had a little.''

Edward Cassidy testified that he was a fireman, a foreman at the Southwest boulevard, No. 9 Company; he was called out on the night of the accident to get a horse out of a hole in the street; the hole was about six feet deep; he saw a broken lantern there, one of the officers pitched it in and it was put on a shelf at the engine house; he did not know the driver, Frank Costello, he knew Mr. Crowder by sight; he could not say whether Costello was drinking or not; the lantern he saw was just a common lantern. There was a plank lying on it when he got out there.

Mr. McGrath, another of the firemen, testified that he went with the fire company to get the horses out of the hole. He found the horse in the hole and got a shovel and got some dirt in there so they could get him out; there were no lights there when the company got there; it was a pretty dark night; he did not see the broken lantern at the hole; one was handed to him at the engine house by a man by the name of Sullivan; he thinks Sullivan brought the lantern to the engine house the next day, and told witness to keep it.

Dr. Baraclaw testified that he lived at 2849 Southwest boulevard, and remembered the accident and recognized the plaintiff as the lady he waited on on that occasion. Asked as to plaintiff's condition as to being intoxicated or drinking, he said he could not tell whether she had been or not; the other lady showed some evidence of hilarity, and one of the young men in the party was drunk; he could not tell his name, had not seen him since, could not identify him. The driver, Costello, and the witness, Crowder, were brought into court at the request of the defendant's attorneys, and the doctor recognized Crowder as one of the party he saw on the night of the accident, but could not remember Costello, could not remember that Costello was intoxicated.

Mr. G. A. Baraclaw testified that he thought the driver was intoxicated some, but when confronted with Mr. Costello said he could not recognize him at all as the party he saw that night; that the man he saw, referred to as intoxicated, was another man.

Ben Williams, another witness, testified for the defendant that he was a hackdriver, and was driving on Southwest boulevard that night, and met or passed Costello on the boulevard between Summit and Broadway; Costello was driving along in a pretty good gait; there was a light on the excavation when witness went out and when he came back; he could not remember whether it was light or dark that night; had no trouble

whatever in seeing Costello and recognizing; him did not remember seeing anybody in Costello's hack.

This is about the substance of the evidence as to the lights. It also comprises the testimony substantially on the question as to whether Costello, the hack-driver, was intoxicated that evening.

As to the nature of the plaintiff's injuries, the plaintiff herself testified that after her injuries she had not been able to work half the time; that she got a good position at Burd & Fletcher's, but was sick so much of the time she had to give it up; she suffered with terrible headaches; sometimes she could work about three days in a week.

Dr. S. H. Ragan testified that he was called to see the plaintiff the next day after her accident and found a great many bruises on her person; he found the right elbow dislocated, he found the upper end of the radius turned around (indicated to the jury the way); the muscle called the biceps, when violence is brought to bear on it, pulls the head of the bone and ruptures the ligaments and pulls the bone around. She was bruised all over; she had had a fall of some kind; her head was bruised, quite a number of blue marks there. The injury to the elbow, in his opinion as a medical man, would be permanent. Injuries to the elbow joint are very slow to heal, they do not repair as other places because they are looser and a fall would make injury to a joint much easier. She had a number of bruises on her back, she complained of injuries in that region. There was also testimony that the plaintiff had lost some thirty or forty pounds in flesh since receiving her injuries, but the physician did not attribute the loss of the flesh to the injury of the elbow, but said it might be, and in his opinion, was the result of the shock to the nervous system.

I. We are asked by the defendant to say that the verdict of the jury is so palpably contrary to the evidence, so arbitrary and capricious, as to shock the conscience of the court in so far as they found that the hole in the boulevard was not guarded with lights or barriers at the time the horses and carriage were precipitated into it and plaintiff injured. This is a vital question in the case; upon its solution depends the liability of the city. The defendant city is bound to keep its streets free from obstructions and dangerous holes and reasonably safe for travel in the ordinary modes and is liable for an injury resulting from a neglect of its duty. [Russell v. Columbia, 74 Mo. 480.] The evidence very clearly shows that the ditch or hole into which the horses fell, which were drawing the carriage in which plaintiff was riding at the time she was hurt, had been dug by the consent and authority of defendant, and when the street was thus rendered unsafe, no question can be made as to the liability of the defendant for the injuries thus produced when the person suffering is without contributory fault or was exercising ordinary care. [Benjamin v. Railroad, 133 Mo. l. c. 285; Haniford v. Kansas City, 103 Mo. l. c. 181.] In view of the evidence already abstracted in the accompanying statement, it is obvious that there was an irreconcilable conflict between the witnesses for the plaintiff and some of those for the defendant. It was the province of the jury, who saw and heard these witnesses testify, to determine which they would believe. If they believed those for the plaintiff, it is perfectly clear that there were neither lights nor barricades to warn the driver of the carriage that there was a dangerous hole in the street, and the night was very dark. On the other hand, had they seen fit to have accepted the testimony of some of the witnesses for the defendant, they must have found that there was at least one lantern on the pile of dirt thrown out of the excavation on the side from which plaintiff approached the obstruction in the

street. It is not for this court to pass upon the credibility of the witnesses; that was the duty of the jury, and they believed the witnesses for the plaintiff, and did not credit those for the defendant. There is no such overwhelming preponderance of evidence in favor of the defendant, and nothing so unreasonable in the testimony of the witnesses for the plaintiff as would justify this court to substitute its judgment for that of the jury and make a finding for the defendant. The first proposition, therefore, advanced by the defendant, must be ruled adversely to the contention of its counsel. On this point of the case, the court gave the jury two instructions requested by the defendant which were as favorable as it could ask.

The jury were also fully justified in finding that the driver of the hack was not intoxicated, and under the circumstances was not guilty of negligence in driving into the ditch, of the existence of which he had no knowledge.

II. Complaint is made of the first instruction given for the plaintiff. That instruction is as follows:

"The court instructs the jury that if you find for the plaintiff, then in estimating the amount of damages to be awarded her you may take into consideration the physical pain, if any, or mental anguish, if any, that you may find and believe from the evidence plaintiff has suffered because or on account of such injuries, if any, and allow her such an amount therefor as under the evidence will reasonably compensate her for such physical pain, if any, or mental anguish, if any; and if you further find and believe from the evidence that plaintiff on account of such injuries, if any, was compelled to lose her means of livelihood, or will in the future be compelled to lose her means of livelihood, you may take this into consideration and allow her such an amount as you may find and believe from the evidence she is entitled to; and if you further find and believe

from the evidence that plaintiff will in the future suffer either physical pain or mental anguish on account of such injuries, if any, you may also take that fact into consideration and allow her therefor such an amount as you may believe from the evidence will reasonably compensate her for such future physical pain, if any, or mental anguish, if any, not to exceed, however, in all the sum of five thousand dollars.''

It is insisted that this instruction is erroneous in that the damages therein allowed are not limited by the allegations of the petition. This criticism is based upon the fact that the plaintiff in stating her damages alleged that at the time of the bringing of the suit she had already lost one month's time, amounting to thirty dollars, and it is complained that the court in the said instruction permitted her to recover not only for future damages that she might suffer by the loss of her means of livelihood, but permitted the jury to find damages in addition to the thirty dollars which she had already suffered because of the loss of her means of livelihood up to the time of the trial. When it is borne in mind that the action was commenced on the 27th of September, 1901, and the allegations of the petition referred to the loss of her means of livelihood from the time of bringing the action, in addition to that which she had already lost, we think there is no merit in the objection to the instruction. The court properly submitted to the jury the damages she had suffered up to the time of the trial as well as those which she would suffer on account of her injuries in the future. We do not think the instruction broadens the recovery beyond that which was prayed for in the petition.

III. It is urged that error was committed in allowing the following question to, and answer by, the witness Mrs. Duffey: Q. ''State whether or not, from your observation since she has been living at your house, she suffers any pain?'' Ans. ''Why, yes, she complains of

pains in her back," because it is said this is mere opinion, is not responsive and not *res gestae*. 1 Greenleaf on Ev., section 102, announces the rule: "Representations, by a sick person, of the nature, symptoms and effects of the malady, under which he is laboring at the time, are received as original evidence. If made to a medical attendant, they are of greater weight as evidence; but, if made to any other person, they are not on that account rejected," and the doctrine thus announced was approved by this court in McHugh v. Railroad, 190 Mo. l. c. 95. But besides this it is clear that no harm resulted to the defendant from permitting the witness to answer this question, because both Dr. Ragan and the witness Biles had testified that the plaintiff complained of pains in her back, without any objection whatever on the part of the defendant. [See 20 Century Digest, Evidence, secs. 377 to 379, inclusive; Estes v. Railroad, 110 Mo. App. l. c. 731.]

The other objection to evidence was that Mrs. Furnkas, in answer to the question, "How much of the time has she been able to work since the injury?" said, "Very little; she has not worked steady at all, I do not think, since the accident." The point made on this answer is that the last sentence of it is mere conclusion or opinion. We think there is very little merit in this objection; it is simply a statement of the witness's own observation of the plaintiff and her work after she was hurt, and she was perfectly competent to state what her observation had been.

IV. Finally it is insisted that the damages allowed by the jury are excessive. We are often confronted with the contention that the damages allowed by juries are excessive, and in personal injury cases it is sometimes apparent that juries are carried away by their sympathies and award amounts out of proportion to the real damages suffered. Each case presents its own merits or demerits, and little assistance can be derived

from what has been done in other cases.   In each case
whether the verdict is the result of passion or preju-
dice or mistake or is but a fair compensation for the
injuries received, must depend largely upon the facts
of the case.   In this case the plaintiff is a young woman
dependent upon her own labor for her livelihood, by
which, it appears that, for a number of years, she had
been earning twelve dollars a week by operating a lin-
otype.   She was in splendid health prior to the injuries
she received.   By her fall, her right elbow was dislocat-
ed and in the opinion of the medical witness this injury
is likely to be permanent.   In addition to this, when
she was thrown from the carriage that night, she was
knocked senseless and received many bruises and con-
tusions on her head and body.   The trial occurred some
eighteen months after she had received her injuries,
and at that time she was unable to work more than a
day or two or perhaps three days at a time; she was
compelled to give up a good position after working a
month, because of her inability to endure the work.   It
further appears that she has lost from thirty to forty
pounds of flesh and is a great sufferer from pains in
her back and head, which the physician testified was a
natural result of the fall from the carriage.   It was the
province of the jury to take into consideration the pre-
vious health and age of the plaintiff and her industrious
habits and capacity to earn a livelihood for herself, and
the loss of time and the suffering she had endured as
well as the permanent injury to her right elbow and the
probability that she would never be able to pursue her
profession or trade as she had previous to her injuries.
To determine the amount of her damages  was one of
the facts which, under our system of jurisprudence, is
committed to a jury in the first instance, and unless we
can say the verdict is obviously the result of passion
or prejudice and should be set aside entirely, or is so
disproportioned to the evidence in the cause that a re-
mittitur ought to be required, the appellate courts are

not justified in interfering with the verdict. The ver-dict in this case met the approval of a trial judge, who had exceptional opportunities to see the plaintiff and hear her testimony, and that of the physician and the female friends with whom she had lived before and after she received her injuries. In view of the serious nature of the injuries, we are of the opinion that we would not be justified in reversing the verdict and judgment on account of passion or prejudice, nor do we think it is a case in which remittitur should be entered as a condition of affirmance of the judgment. The case is evidently a meritorious one and the judgment is affirmed.

*Burgess, P. J.,* and *Fox, J.,* concur.