Leonard Kleinlein v. Stephen R. Foskin, Appellant.—13 S. W. (2d) 648.

Division One, February 1, 1929.

*Brackman, Hausner & Versen* for appellant.

*Foristel, Mudd, Blair & Habenicht* for respondent.

SEDDON, C.—Action to recover damages for personal injuries alleged to have been suffered by plaintiff (respondent) and to have been caused by the negligent operation of an automobile, claimed to have been owned and driven by the defendant (appellant) at the time of plaintiff's alleged injury. The cause was tried and submitted to a jury, resulting in a finding and verdict for plaintiff in the sum of $9,375, and judgment was entered in accordance with the verdict. After an unsuccessful motion for a new trial, defendant was allowed an appeal to this court from the judgment *nisi*.

The petition charged defendant with five acts of primary negligence, and also with negligence under the humanitarian rule. The answer was a general denial. Plaintiff submitted his case upon two of the specifications of primary negligence, namely, the driving and operation of the automobile by defendant at a rate of speed which was high, unsafe and dangerous under the circumstances and conditions in evidence, and so as to endanger the life or limb of plaintiff, and failure to give the plaintiff any warning of the approach of the automobile; plaintiff also submitted his case upon the humanitarian rule or doctrine of negligence.

The evidence tends to show that plaintiff was injured about four or 4:30 o'clock on the afternoon of March 30, 1924, at or near the intersection of Easton and Newstead Avenues, both being public streets in the city of St. Louis. Easton Avenue is an east-and-west street, while Newstead Avenue extends north and south. There is a jog in Newstead Avenue at its intersection with Easton Avenue; that is to say, Newstead Avenue runs southwardly from the south line of Easton Avenue, and, about 150 feet west of its intersection with the south line of Easton Avenue, Newstead Avenue continues northwardly from the north line of Easton Avenue. There is a double track street car line on Easton Avenue, the eastbound cars using the south track and the westbound cars using the north track. The customary stopping place for east bound street cars is at the southwest corner of the intersection of Easton Avenue and that part of Newstead Avenue which extends south from the south line of Easton Avenue.

Plaintiff testified that he had been attending a meeting held for some purpose in a building located on the north side of Easton Avenue and a short distance east of the intersection with Newstead Avenue; that, upon leaving said building, he walked west on the

north sidewalk of Easton Avenue, intending to take an eastbound street car at the customary stopping place at the southwest corner of the intersection of Easton and Newstead Avenues; that, when he reached a point on the north sidewalk of Easton Avenue about opposite the customary street-car stopping place, he saw an eastbound street car approaching from the west and coming to a stop at the customary stopping place, and that he signaled to the motorman of the street car that he desired to take passage thereon; that he stood upon the north curb of Easton Avenue and "looked up and down Easton Avenue, east and west, and no automobile was coming either way;" that he then stepped from the curb into the roadway of Easton Avenue, and had taken three or four steps to the south, when he was struck by an automobile; that the left side of the automobile struck him on the leg and knocked him down; and that he did not see or hear any automobile approaching him until he was struck.

The motorman of the street car testified on behalf of plaintiff, as follows: "I was going east. I made my stop at Easton Avenue and Newstead, a regular stop. There was a large car (automobile), a large, expensive car coming north on Newstead, and that car stopped to let me by; and there was another car, a Ford car, I think it was, a touring car, it came north on the east side of that Packard or expensive car, and he went around and, when he came to the north curb of Easton Avenue, he hit Mr. Kleinlein (plaintiff) as he stepped off the sidewalk. He (plaintiff) made a couple of steps and then it hit him. That machine kept on going about fifty or sixty feet west, and stopped. The man got out (of the automobile) and walked down to the man that was hurt; that man that drove the machine got out of the machine and walked to Mr. Kleinlein (plaintiff). I moved on when he walked down to the man that was hurt. This automobile, on this occasion, was going fifteen miles an hour as it made the turn. No signal of any kind was sounded. I saw Mr. Kleinlein at the time this man made the turn. When Mr. Kleinlein stepped into the street, the automobile was about twenty-five feet from him. There was nothing between the automobile and Kleinlein. No signal was sounded, and the speed was not changed. This automobile came from the south. It passed in front of me as I was about ready to start up. There was a Packard, or a big touring car, waiting for me to pass. The car that hit Mr. Kleinlein came from the south and swung around in front of my car and swung west on Easton Avenue and stopped, and that man got out. It was an open Ford, either touring or roadster; I believe it was a touring car that passed in front of me and swung around. The driver made the turn pretty round; he was about past the westbound track when he turned. The front left corner of the car struck Mr. Kleinlein and knocked him down, knocked him back, a couple of feet in front of me. Mr. Kleinlein crossed the street at the sidewalk, the regular line of the

sidewalk, and it was right in front of me. He was a couple of feet away from the westbound street-car track when struck. He got struck four or five or six feet from the north curb. He made a couple of steps when he got off and got struck, and that would be about five or six feet from the curb, and when he left the curb five or six feet behind him, the automobile came around and the left front corner was what struck Mr. Kleinlein. I am positive that the car which struck Mr. Kleinlein came around in front of my car, and swung around going west.''

The conductor of the street car testified that he did not see the automobile strike plaintiff, but when his attention was directed to the casualty by someone on the street car, he saw plaintiff lying upon the street, closer to the curb than to the car tracks; he also saw a Ford roadster or touring car some distance to the west, and saw this automobile pull over to the curb and stop, and a man got out of the automobile and came back to the place where plaintiff was lying in the street.

George House, a thirteen-year-old boy, testified on behalf of plaintiff, as follows: ''I was on Easton Avenue on the same side of the street that the gasoline station is on. I saw a street car and saw a man come out of one of those little places and walk down the street, holding his head up and telling the motorman to stop, and at that time an automobile came along and it hit him and he fell, and then some men came up there and picked him up. After the automobile hit him, it went where the gasoline station is. They came back and picked the man up and put him right in the automobile that hit him and went off. The gasoline station is on Newstead and Easton Avenues. The gasoline station is not on the corner where the street car stops to take on passengers to go east, but on the other corner. I was coming east on the same side of the street as the gasoline station is on, I think the north side. I was looking toward the road, the street car was going east, and I was too. I saw Mr. Kleinlein before he was hit, when he came to the sidewalk. I was on the same sidewalk that Mr. Kleinlein was on, about three or four feet from him when he started across the street. I didn't see an automobile coming from the east until it hit him, and then he fell. I didn't see the automobile make a turn, or swing around. I didn't see the automobile come from the south and swing around and go towards the west. I never noticed what sort of an automobile it was. All I know is that some men came out and picked Mr. Kleinlein up and put him in the automobile and went on away with him. When I saw this man come back and pick him up and put him in the automobile, I concluded that it was the automobile that hit him. That is why I know that automobile hit him. Mr. Kleinlein was on the street. They pulled him to the sidewalk, and someone asked if he wanted some water, and the man came out with the automobile and put him in it and went away.

The front part of the car struck him. I don't know whether the wheels, fender or radiator; the front part. I saw them put Mr. Kleinlein in the automobile that hit him."

Witness Harry Ockel, who was a passenger on the eastbound street car, testified on behalf of plaintiff, as follows: "The car that I was riding on stopped at Newstead Avenue. I was in the car, the second seat from the front end on the left-hand side, sitting in the seat next to the window. The car was eastbound on Easton Avenue. When I got to the corner the car was coming to a stop, and as I was looking out towards the north side of the street, I seen this old gentleman coming from the sidewalk, looking both ways, like he was looking to see if he had a chance to get across, like he was going towards the car, and just then something else drawed my attention to the door in the meantime. After I saw that, and when I looked over this way again, I saw the old gentleman lying on the car track, next to me, on the north or westbound track. I think there was an automobile there in that vicinity standing up at the curb, and when I got out of the car to help the old man, to go to his assistance, there was another machine further up ahead. By that time another fellow came along and helped me to carry the old gentleman to the curbstone. That is the only car I seen. I know that couldn't have hit him, but the car ahead may have hit him. The car that I speak of was standing parked at the curb, the north curb of Easton Avenue. That car was parallel with the north curbstone on Easton Avenue. but the car up ahead—it seemed like it just drove in or something like that. The position of the car that was the farther west of the two automobiles, with reference to its position at the curb—the back wheels were further out than the front wheels. The farthest automobile, the one we put the old gentleman in, was quite a distance from the curb, about six feet from the curb this way, because it seemed like he had just drove up there and stopped. We carried the old gentleman right up to the car there and put him in. I didn't see anything that hit the old gentleman. I seen the old gentleman leave the curbstone and look both ways, and. just about that time something drawed my attention to the front door. and when I looked around again I seen him lying on the westbound street car track. That is when I got up to go out to give him a lift. When I got to him, he was lying on his right shoulder, all crumpled up like. I asked somebody that had a machine to take him to the hospital. I didn't notice what make machine it was that the old man was put in, but it was a touring car. about forty or fifty feet ahead of where the old man lay in the street. I didn't notice anybody in the other car that was standing there parked at the curb."

Cross-examination: "I was sitting two seats from the front, next to the window, on a Wellston street car that was going east. When I saw Mr. Kleinlein first. this car was going, but when it came to a

stop I drawed my attention to this side, and when I looked back again that is when I seen the old gentleman in the track. When I saw him he was looking both ways to see if he had a clearance, to see if he could get across. I saw him look both ways. I saw him go across. I just saw him leaving the curb, and then something drawed my attention to the door, and I looked the other way. I think a gentleman getting off the front end of the car attracted my attention. I didn't notice any other automobiles in the street at that time. I don't know whether there was a machine coming from the east or not; I didn't take a bit of notice. As to the time that elapsed before I looked again and saw this man lying in the street, I looked over here and moved my head and looked around, and there he was lying there. He was lying with his head to the west and his feet to the east, and lying right on his shoulders, crumpled up there. He was about the center of the westbound car track, between the two rails. He was lying parallel with the tracks. I just saw one car (automobile) on that one side of the curb, and the other (automobile) up there ahead a little ways, about fifty feet. I didn't see either of the cars in motion. I didn't see any cars to the right of me, or at the corner of Easton and Newstead. I got up and ran out to help this man. I got there first, and finally a couple of fellows came up. I didn't hear any one make a statement as to how it happened, or that the automobile struck the man. I didn't make a statement as to how it happened; all I had on my mind was to do something for the old man, and I asked somebody to get some water and nobody seemed to bother, and I said, 'Who has got a machine?' and somebody said, 'I got a machine,' so we went over and put him in the machine and took him to the hospital. I don't know who the man was that had the machine, or whether it was the same man that helped take him to the curb; that didn't come to my mind; I just wanted to help this old man. We carried him into the Ford machine. about forty or fifty feet up ahead. I think there was a woman with a little boy in the machine; a man driver. I can't recall who else. I didn't take notice of how many passengers were in the car. The man that was hurt was put in the back seat. I rode in there with him, and we took him to the hospital."

The defendant, Stephen R. Foskin. testified, in substance. that he. his wife and his cousin were traveling west on the north side of Easton Avenue. between four and 4:30 o'clock on the Sunday afternoon of plaintiff's injury, for the purpose of taking defendant's cousin to his home. which was on Wells Avenue, that defendant re sided on St. Louis Avenue, located some seven or eight blocks north of Easton Avenue. and about three blocks east of Newstead Avenue; that the residence of defendant's cousin, on Wells Avenue, was located several blocks west of Newstead Avenue. and one block south of Easton Avenue; that, in traveling from defendant's home on St.

Louis Avenue toward the home of his cousin on Wells Avenue, defendant drove his automobile south to Easton Avenue, and thence west on the north side of Easton Avenue, intending to turn south from Easton Avenue to Wells Avenue when he reached a cross-street near the cousin's home; that defendant was driving a Ford touring car, of which defendant was the owner, the defendant and his wife occupying the front seat, and defendant's cousin sitting in the rear seat, of the automobile; that when the Ford automobile reached the west intersection of Newstead and Easton Avenues, defendant's cousin "hollered to me to stop, that there was someone lying in the street, and I pulled into the curbing right at the corner of west Newstead;" that defendant, his wife and cousin got out of the automobile and went back to the place where plaintiff was lying, which was on the south rail of the north, or westbound, street-car track on Easton Avenue; that some bystander remarked that plaintiff had fallen in the street, or on the ca⁻ track, and another bystander made the suggestion that plaintiff should be taken to a hospital; that defendant thereupon volunteered to take plaintiff to a hospital and offered the use of his Ford automobile for that purpose.

The testimony of defendant's wife and cousin in all respects corroborated the testimony of defendant. All of the occupants of defendant's automobile denied seeing plaintiff attempting to cross Easton Avenue, and were quite positive in their testimony that defendant's automobile did not strike, or come in contact with, the plaintiff. They testified further that they were looking ahead as the automobile approached the intersection of Newstead and Easton Avenues, and that they would have seen plaintiff had he been in the act of crossing Easton Avenue from the north to the south. All of the occupants of defendant's automobile likewise positively denied that the automobile had been driven south of Easton Avenue at any time on the afternoon in question, or that they had traveled northward on the south extension of Newstead Avenue, or that they had made a left-hand turn, or "swing-around," at the intersection of Newstead and Easton Avenues, in order to proceed westwardly on Easton Avenue; on the contrary, they testified very positively that the automobile "was going due west on the north side of Easton Avenue all the time." Defendant testified that his Ford automobile was traveling at a speed of fifteen miles an hour, when his cousin called to him to stop the automobile, and that he stopped the automobile immediately, and within a distance of five feet. Defendant testified further that, after plaintiff had been taken to the hospital in defendant's Ford automobile, defendant went to a police station and made a report "that this man fell to the street from some cause unknown; I thought it was my duty to do so; I just made the report because I didn't know how serious the man might have been injured; I didn't know anything about the man, and I thought it the proper

thing to do to report it to the police, so that they could get in touch with his friends or relatives.''

From the foregoing testimony on behalf of defendant, it will be seen that defendant's defense on the trial of the cause was predicated upon the single ground that defendant's automobile did not strike plaintiff, and was not the cause of his injury, but that defendant was an innocent bystander, who chanced to pass the place of the accident concurrently with, or very shortly after, plaintiff's injury, and who charitably volunteered to take the plaintiff to a hospital when a suggestion to that effect was made by another.

Respecting his injuries, plaintiff's own testimony was to the effect that he was fifty-seven years of age at the time of his injury; that he was rendered unconscious by the impact of the automobile, and that he did not recover consciousness until after he had been taken to the hospital on the afternoon of his injury; that blood was running from the top of his head and he was unable to move his left leg; that he was confined to the hospital for three weeks; that, during the first week of his confinement in the hospital, the physicians placed a tube through his nose, extending into the stomach; that he had severe pains in the stomach; that a plaster cast was put on the left leg, to keep it rigid, extending from the ankle to the middle of the upper leg; that another plaster cast, lighter than the first cast, was afterward put on the leg; that he wore the plaster casts for about three months; that he was confined to bed for a period of over four months; that he walked on crutches for about a year, and walked with a cane for about two months immediately preceding the trial of the cause, which was in October, 1925; and that, at the time of the trial, he suffered ''continuous pain in my leg, day and night, across my heel and in the ankle, and all the way up in front of my head; and sometimes everything gets dark before me, I lose my eyesight: that is the same day and night; and I still suffer from heavy and pressing pains in my stomach.''

Dr. Kleinfelter, an attending physician, testified that he first saw plaintiff at the hospital on the night of his injury, March 30, 1924; that plaintiff was conscious, but apparently ''shocked or knocked out;'' that plaintiff complained of pain in the left leg and in the head; that an X-ray examination of his left leg revealed a fracture of the smaller bone of the leg, the fibula, near the knee; that plaintiff had a wound on his head; that a plaster cast was put upon the fractured leg and the leg remained for some time in the cast; that ''plaintiff had a pretty severe attack with his abdomen while he was in the hospital; I don't know what it was; I don't know yet what was the matter with him, but he got severely ill with his abdomen; he complained of his back some, but we couldn't find anything the matter with his back, except he complained of pain in his back; the X-ray didn't show a fracture there;'' that the fracture of the leg

"united all right;" that plaintiff left the hospital on April 21, 1924, wearing the cast on the left leg; that witness saw plaintiff occasionally after leaving the hospital, the physician's last visit being September 17, 1924; that it is quite possible that plaintiff may suffer pain in the left leg and knee; that a fibula broken close to the knee, as a rule, is accompanied with a sprain of the knee, and there is very frequently pain for a long time in the case of a patient of plaintiff's age, depending upon how much the ligaments are torn; that an examination was made of plaintiff's leg for the purpose of discovering whether the ligaments were torn, but no torn ligaments were discovered by the use of the X-ray; that the pain in the leg was probably due to a sprain of the knee; that if the fibula is broken, without the tibia also being broken, such fact would indicate that the fibula was broken by a direct or violent blow on the bone, and that such a fracture is not likely to result from a mere fall, or without something striking the bone.

Dr. Ernst testified that he made an X-ray examination of plaintiff's knee on September 5, 1925; that such examination disclosed evidences of a fracture of the fibula; that the upper end of the fibula is irregular; that one bone was impacted, or slightly driven into another bone about a quarter of an inch; that callus had been thrown out along the side of this injury; that the knee joint showed "evidence of considerable irregularity; there is a roughened condition, and it is apparently of the arthritic type of irregularity;" and that the motion of the knee joint is limited, and, if complete motion is had, it must be accompanied with some pain.

Dr. Weiterer testified that he was called to attend plaintiff in the early part of July, 1924, and had thereafter attended plaintiff every two or three weeks until the time of the trial; that there was still (at the time of the trial, October, 1925) considerable soreness and swelling in plaintiff's left knee, and in the tendons and ligaments; that the condition is a permanent one, and, as a general rule, such condition results from a trauma.

The evidence further shows that plaintiff had followed the business of florist, dealing in artificial and natural flowers; that he was not actually engaged in such business at the time of his injury, having theretofore sold, or disposed of, his business, but he testified that he was looking for a location in which to engage in the same business at the time of his injury; that, during the busy season, his net profits from the floral business averaged approximately $1000 per month, and in the dull season the net profits from such business averaged about $750 a month, or $25 per day. Plaintiff further testified that, since his injury, he had made some artificial flowers at his home, filling telephone orders taken by his daughter, and that his income from such work was very small, but if he were physically able to get

about and take orders for such work, he could earn from $25 to $50 a week in the manufacture and sale of artificial flowers.

Appellant assigns error in the giving of certain instructions on behalf of plaintiff, and that the verdict is excessive, and so grossly excessive as to indicate passion, bias and prejudice on the part of the jury; wherefore, appellant insists that the judgment *nisi* should be reversed and the cause remanded for retrial.

I. Prejudicial and reversible error is claimed to have been committed by the trial court in the giving of plaintiff's instruction numbered 2, which reads:

"*The court instructs the jury that there is no defense of contributory negligence on the part of the plaintiff pleaded by the defendant in its answer in this case, and therefore no such issue is before you and you are not called upon in your deliberations to consider at all any question of negligence on the part of the plaintiff;* but if you find that the defendant himself, in the management of his automobile at and shortly before the collision with and injury to plaintiff, if you find there was such collision and injury, was negligent in any one or more of the several specifications of negligence on the part of the defendant, as more particularly set out in Instruction 1 given you, and that said collision and injury to plaintiff was caused as a direct and proximate result of negligence as set out in said Instruction 1, then your verdict must be for the plaintiff and against the defendant *without regard to any question of negligence on the part of the plaintiff.*" (Italics ours.)

Criticism is made of such instruction in several respects. It is urged by appellant that there was no issue of "contributory negligence" in the case, and hence that the trial court erred in instructing on, or referring to, a matter which is not in issue; that the instruction unfairly comments upon, features, and unduly emphasizes defendant's failure to plead the contributory negligence of plaintiff as an affirmative defense to plaintiff's cause of action; that the instruction is argumentative and misleading; and that the instruction entirely excludes from the consideration of the jury any and all negligence of the plaintiff, even though *plaintiff's own negligence* may have been the *sole cause* of his injuries. A further criticism suggested by appellant is that the instruction uses the possessive form of the pronoun "it," in referring to the answer of the individual defendant as "*its* answer," thereby unduly emphasizing the fact that an insurance company was defending the case on behalf of the individual defendant.

It is strenuously argued by appellant that, inasmuch as the theory of defendant's defense on the trial of the cause was that defendant's automobile was not the one which struck and injured the plaintiff (if plaintiff in fact was injured by being struck by any automobile).

which defense is properly presented by the general denial of the answer, therefore the defendant could not have consistently pleaded the contributory negligence of the plaintiff, as an affirmative defense to plaintiff's action, without thereby admitting defendant's guilt; hence, it is claimed that it was prejudicial to defendant for the court to comment upon, and emphasize, defendant's failure to plead contributory negligence as an affirmative defense to plaintiff's action. But appellant, in making such claim, is not supported by the weight of judicial authority, for, under the code procedure prevailing in this State, and in a majority of our sister states, which procedure permits (and, in our State, requires) answers both in denial and in confession and avoidance to be joined and filed as a single pleading, it has been uniformly held and ruled that a general denial and a plea of contributory negligence, although both are pleaded and joined in the single answer, do not constitute inconsistent defenses. [45 C. J. 1118, and cases there cited; Peterson v. Street Ry. Co., 211 Mo. 498, 520; McDonald v. Construction Co., 183 Mo. App. 415, 423.] It is also the general rule, in this and most other jurisdictions, that contributory negligence is a special and affirmative defense, which, in order to be available to defendant, must be specially pleaded in the answer. [45 C. J. 1115, and cases there cited; Lauck v. Reis, 310 Mo. 184, 195; Jewell v. Bolt & Nut Co., 231 Mo. 176, 200; George v. Railroad Co., 225 Mo. 364, 413; Peterson v. Railway Co., 265 Mo. 462, 479; Boesel v. Wells Fargo & Co., 260 Mo. 463, 474.] It is likewise a well-recognized rule of law that the issues in a cause are made and raised alone by the pleadings. [Bank v. Westlake, 21 Mo. App. 565, 573; Christian v. Insurance Co., 143 Mo. 460, 469; Glass v. Gelvin, 80 Mo. 297, 302; Bank v. Murdock, 62 Mo. 70.]

It is not claimed by appellant that the instruction misstates the issues presented and made by the pleadings; on the contrary, the statement in the instruction (to the effect that defendant had not pleaded contributory negligence on the part of plaintiff in the answer, and therefore no such issue was before the jury for their consideration and deliberation) is true both in fact and in law. It seems to us that the most that can be said of the statement in the instruction is that (perhaps) the same amounts to a mere abstract statement of law. But it is a general and recognized rule of law that the giving of an abstract instruction will not warrant, or constitute ground for, a reversal of a judgment, unless it appears that thereby the complaining party was injured or prejudiced, or that the jury could have been misled or confused. [38 Cyc. 1614; Randall on Instructions to Juries, sec. 122; Clark v. Cox, 118 Mo. 652, 657; McGrew v. Railway Co., 109 Mo. 582, 589; Hemphill v. Kansas City, 100 Mo. App. 563, 567.] This court has ruled, in Burdoin v. Town of Trenton, 116 Mo. 358, 371, that an abstract statement of law in an instruction will not form the basis for a reversal when accompanied with a further call for a

finding of all the facts required by law to create a liability on defendant's part. Appellant does not criticise, or question the correctness of, that portion of the instruction which calls for a finding by the jury of the hypothesized facts necessary to create a liability on defendant's part for the negligent management and operation of his automobile. The criticism of appellant is leveled solely and only at that portion of the instruction which deals with the question of contributory negligence on the part of the plaintiff, and which tells the jury that no such issue is before them, and therefore the jury are not called upon, or required, in their deliberations to consider and decide any question of plaintiff's negligence.

Appellant furthermore says (quoting the language of his brief) that "the giving of this instruction under the issues in the case was calculated to induce the jury to believe that the court considered defendant (to be) the guilty party, and that in the court's mind the question of identity (of the driver and owner of the automobile which struck and injured plaintiff) was settled;" and it is therefore urged that the instruction was "a comment on the conduct of defendant, and inclined to be argumentative." As we read and view the instruction, it makes no "comment on defendant's conduct," and we see nothing in the instruction which might tend to indicate to the jury, or induce them to believe, that defendant was the guilty and negligent driver of the automobile, or that defendant's automobile was the one which struck and injured plaintiff. On the contrary, the instruction clearly required the jury to find, as a prerequisite to a verdict for plaintiff, that there was in fact a collision of defendant's automobile with the plaintiff, and that plaintiff was proximately injured thereby, and also to find that the defendant himself was negligent, in the several respects set out in another instruction, in the management of his automobile at the time in question. Furthermore, the trial court gave the following instruction, numbered 5, at the request of defendant: "The court instructs the jury that if you believe and find from the evidence that the plaintiff was not struck or caused to fall on the street by the automobile of the defendant at the time mentioned in the evidence, then your verdict must be in favor of the defendant." When the two instructions are read and considered as a whole, they seem to have fairly submitted to the jury the conflicting theories of the respective parties, without the slightest suggestion of the bent of mind, or view, of the trial court respecting any or either theory, and so we believe that it is not likely that the jury were, or could have been, misled or confused by the giving of plaintiff's instruction aforesaid. [Fugate v. Millar, 109 Mo. 281, 290.]

Neither do we view plaintiff's instruction numbered 2 as being argumentative in character; the instruction in no sense can be said to *argue* the merit of the theory presented by either party, or to

prejudice the jury against either party in the determination of the issues and theories actually submitted. Nor do we think the instruction can be held to be an unfair and prejudicial commentary by the trial court upon defendant's failure to plead contributory negligence as an affirmative defense to plaintiff's action, for the reason that the court gave no hint or suggestion therein that such failure on defendant's part (to affirmatively plead the contributory negligence of plaintiff) had any bearing or effect upon the issues and theories which were actually submitted to the jury for determination, but only told the jury, in effect, that, inasmuch as the defendant did not plead contributory negligence as an affirmative defense in his answer, no such issue of contributory negligence was before them for their consideration and finding. Such statement or declaration in the instruction, as we have heretofore said, is true both in fact and in law, and it is not apparent to our minds that such statement, or declaration, could have worked any harm or prejudice to the defendant, or could have misled or confused the jury in their determination of the issues and theories actually submitted.

Appellant's chief criticism of the instruction is that "it entirely excluded the proposition that *plaintiff's own negligence* may have been the *sole cause* of his injuries." Appellant contends that he had the right to a submission of such issue as an available defense under the general denial of the answer, and without affirmatively and specially pleading such matter of defense in the answer. Appellant cites Derrington v. City of Poplar Bluff (Mo. App.), 186 S. W. 561, and Boesel v. Wells Fargo & Co., 260 Mo. 463, as supporting such contention. However, the rule of law announced in both of the cited cases is clearly and positively to the effect that the contributory negligence of plaintiff is available to defendant as an affirmative defense only when such defense is specially pleaded in the answer, except where the *plaintiff's own proof* is such as to show contributory negligence on his part *to an extent barring a recovery as a matter of law.* For example, in the Boesel case, supra, Faris, J., speaking for this court, en banc, said (l. c. 474): "Contributory negligence was not pleaded by defendant. *To render it available as an affirmative defense, it must have been pleaded. . . .* If the proof of plaintiff showed her contributory negligence to an extent barring recovery as a matter of law, then such negligence was available to defendant here even though not pleaded. [Citing cases.] *In such case, the defendant's demurrer to the evidence of plaintiff should have been sustained.* [White v. Railroad, 250 Mo. 476.] A submission to the jury of the issue of plaintiff's contributory negligence when no such defense was made in the answer, was clearly erroneous and reversible error, unless we can find from the whole evidence of plaintiff that she herself shows her own contributory negligence to an extent which as a matter of law forbids a judgment in her favor."

In White v. Railways Co., 250 Mo. 476, 482, this division of our court said: "The theory upon which a defendant, despite a failure to plead it, is permitted to avail himself of plaintiff's conclusive proof of his own contributory negligence, is that in such circumstances *plaintiff fails to make out his case. He disproves it.* Recovery can be had only for injuries resulting from the defendant's negligence and *there is a failure of proof when plaintiff conclusively shows he is himself responsible for his injury.* [Citing cases.] The reason for the rule in cases in which contributory negligence appears as a matter of law from plaintiff's testimony affords, therefore, no basis for the conclusion that, when testimony merely *tending* to show contributory negligence is offered by plaintiff, an issue of fact is thereby raised in the absence of a proper plea."

And so our lately deceased brother, Judge GRAVES, thus pointedly expressed the rule in Sissel v. Railroad Co., 214 Mo. 515, 526: "Without a proper plea of contributory negligence the defendant should not be permitted to show, affirmatively, by his proof, that there was contributory negligence, but where the witnesses for plaintiff disclose the facts, and the court is thus possessed of them, such court has but one course to follow, and that is to say that *by plaintiff's proof no case has been made.* . . . This is the reasonable rule and the common sense rule. It matters not upon what ground the *plaintiff's evidence* discloses the absence of a meritorious cause, if such evidence is made to appear to the court, the court has but one duty to perform, i. e., say so, by proper instruction to the jury. In so doing the court simply says to the plaintiff, 'By your own proof you have no standing in a court of justice.'" (Above italics ours.)

Appellant makes no point upon this appeal, however, that the *plaintiff, by his own evidence, conclusively shows himself to have been responsible for his injury, or that, by his own evidence, plaintiff disproved his case.* Neither does appellant assign as error the refusal of his peremptory instructions, in the nature of demurrers to the evidence, offered both at the close of plaintiff's evidence and at the close of all the evidence. Absent such assignment, the error (if any there be) in the refusal of defendant's demurrers to the evidence must be deemed to be waived by appellant. But the record before us indubitably discloses that the *proof of plaintiff* does *not* disprove his case. Nor does plaintiff's proof *conclusively* show that plaintiff, himself, is responsible for his injury; or can we say that the proof shows that plaintiff was contributorily negligent *as a matter of law.* On the other hand, it is exceedingly doubtful whether the evidence herein can be said to be sufficient to convict plaintiff of contributory negligence as a matter of fact, and whether, if plaintiff's contributory negligence had been affirmatively pleaded as a defense in the answer, the evidence herein is sufficient to have justified the submission of such issue of fact to the jury. In other words, had the

appellant requested the trial court to instruct the jury to the effect that plaintiff could not recover if the jury should find that *plaintiff's negligence* was the *sole cause* of his injuries, the giving of such an instruction would have been reversible error, for the reason that the record herein is wholly devoid of any evidence upon which to base such an instruction. [Rettlia v. Salomon, 308 Mo. 673, 680; State ex rel. v. Daues, 314 Mo. 282, 287.] If appellant was not entitled to an instruction predicated upon a finding that *plaintiff's negligence* was the *sole cause* of his injury, then it logically follows, we think, that appellant ought not to be heard to complain of plaintiff's instruction numbered 2 upon the ground that it excluded from the jury the consideration of the same and identical matter. The evidence herein does not entitle appellant to the submission of such matter, and therefore appellant was not harmed by the giving of plaintiff's criticised instruction.

Lastly, the appellant criticises the instruction in the use of the pronoun "it," in the possessive form, by referring to the answer of the individual defendant as *"its"* answer. Appellant claims that the use of such possessive pronoun unduly emphasized the fact that an insurance company was defending the case in the stead, and on behalf, of the individual defendant. It seems apparent that the insertion of the possessive pronoun "its" for the pronoun "his" was merely a typographical error or inaccuracy, and falls within the class denominated as "clerical errors." We doubt if any lay juror would even discover the slight inaccuracy mentioned, much more attribute any significance or consequence thereto. It requires the close and searching scrutiny of an unsuccessful litigant, or his skilled counsel, to discover such typographical inaccuracies in an instruction, and, if perchance discovered, to ascribe some remote or possible harm as consequentially flowing therefrom. An appellate court should not classify such inconsequential and harmless inaccuracies of language and expression in an instruction in the category of reversible error. Besides, it has been said by this court that "it is good doctrine that a mere clerical mistake is not fatal." [Shinn v. Railways Co., 248 Mo. 173, 179; Cassidy v. St. Joseph, 247 Mo. 197, 204.]

We have given careful and thoughtful consideration to the several grounds of criticism laid against the plaintiff's instruction numbered 2, and we have reached the conclusion that no harm or prejudice was occasioned to appellant by the instruction, and that it is improbable that the jury could have been confused or misled thereby, and hence we hold that the giving thereof does not constitute reversible error in the instant case and upon the present record. But we are not to be understood as commending or approving the practice of requesting, and of giving, instructions which are similar in character to that under review in the present case. We are mindful of

the rule that it is the positive duty of the trial court to fairly and fully state to the jury, by way of instruction, the issues which are presented and made by the pleadings in a cause, and which are submitted to the jury for their finding and determination. Such duty is ordinarily and usually performed by the court stating to the jury, in appropriate instructions, what issues *are* made by the pleadings in the case and what issues *are* actually submitted to the jury for finding and determination, rather than by telling the jury what issues are *not* in the case, and are *not* submitted. Ofttimes it happens that issues are made by the pleadings and thereafter abandoned on the trial by the parties; in such instances, we have ruled that the submission of a cause to the jury upon one or more unabandoned issues takes the abandoned issues (not submitted) out of the case as fully as if taken out by proper and cautiously drawn withdrawal instructions; and, in such connection, we have held that the refusal by the trial court of requested instructions, designed to withdraw from the consideration of the jury such abandoned issues, works no harm and does not constitute error. The reason assigned for our holding in such cases is that such withdrawal instructions tend to confuse and mislead the jury with respect to the unabandoned issues actually submitted, and with respect to the application of the evidence bearing upon the unabandoned and submitted issues. [Reith v. Tober (Mo. Sup.), 8 S. W. (2d) 607, 611; Schulz v. Smercina (Mo. Sup.), 1 S. W. (2d) 113, 119; Dietzman v. Screw Co., 300 Mo. 196, 215.] There may be cases wherein an instruction which states (as does the instruction in the present case) that an issue is *not* in the case, such statement being also coupled with the actual submission of one or more issues of fact, might be confusing and misleading to the jury, and therefore work some harm or prejudice to the opposing litigant. Hence, we sound a note of warning by saying that we regard it as the safer and better practice for the trial court to instruct the jury upon the issues which *are* made by the pleadings in the case, and which *are* actually submitted for the determination of the jury, rather than to undertake to tell the jury in an instruction what issues are *not* in the case and are *not* submitted. A somewhat similar instruction was mildly criticised by this division of our court in Spencer v. Railroad Co., 297 S. W. 353, 356, wherein we said: "Plaintiff offered and the court gave two instructions 'on the issue of contributory negligence.' There was no such issue. What plaintiff's purpose was in setting up a 'straw man' to knock down is not discernible. . . . The instruction was merely useless luggage. Defendant does not seem to have been prejudiced thereby."

II. Appellant assigns error in the giving of plaintiff's instruction numbered 3, on the measure of damages, which told the jury that, in fixing the amount of compensation to be awarded the plaintiff, in case their verdict should be in favor of the plaintiff, the jury might take into consideration (among other elements of damage set forth in the instruction) "any impairment of plaintiff's ability to engage in his business as a florist, if any, as shown by the evidence; also if you find from the evidence that plaintiff, because and as a direct result of his said injuries, if any, will suffer disability in the future to engage in and conduct his business as a florist and will suffer loss on that account, then you may also take such disability and loss into consideration; . . . and after considering all these things, you may then award the plaintiff such gross sum as compensation for his said injuries, if any, as you believe will be fair and reasonable."

The petition, among other matters, alleges: "That as a result of said injuries, plaintiff has been rendered unable to engage in his business of florist, and has lost the earnings and profits which he would otherwise have made, in the sum of, to-wit, one thousand dollars; that plaintiff will be unable in the future to engage in said business, and as a result thereof will lose large sums of money, in an amount to plaintiff at present unknown; that plaintiff's earning power has been greatly and permanently impaired." The petition prays judgment in the gross, or aggregate, sum of $10,000. The evidence shows that plaintiff was injured on March 30, 1924, and the record discloses that the present suit was commenced on July 12, 1924; therefore, the suit was commenced 104 days, or 15 weeks (lacking one day), after the date of plaintiff's injury. There was testimony by plaintiff that, were it not for his injury and incapacity therefrom, he could get about and solicit orders for artificial flowers, and thereby earn from $25 to $50 a week.

It is contended by appellant that plaintiff's Instruction 3 is erroneous because it fails to limit the recovery of special damages for loss of past earnings (from the time of plaintiff's alleged injury, March 30, 1924, up to the time of filing the suit, July 12, 1924) to the amount pleaded in the petition, viz., $1,000; hence, it is urged that "the jury were given a roving commission to find for any amount, irrespective of the amount which plaintiff pleaded constituted his loss." It will be noticed that the instruction makes no reference, in direct language, to *any loss of past earnings* (i. e., earnings lost by plaintiff, as a result of his injury, prior to the commencement of his suit), but tells the jury that they may take into consideration, in fixing the amount of plaintiff's damage or compensation, "any impairment of plaintiff's ability to engage in his business as a florist, if any, as shown by the evidence." Our courts, in several cases, have made a clear distinction between the diminution or *impairment of the*

*capacity to labor* and the *loss of earnings,* and have held that a recovery may be had for the diminution or impairment of the capacity to labor, although there may, in fact, be no actual loss of earnings. [Steinkamp v. Chamberlain Co. (Mo. App.), 294 S. W. 762, 764, and cases cited; Perrigo v. St. Louis, 185 Mo. 274, 288, and cases cited.] In the Perrigo case, supra, BRACE, P. J., speaking for this division of this court, said: "The contention being that as the plaintiff is a married woman her services belong to her husband and hence she is not entitled to damages for the *impairment of her ability to work.* . . . *The impairment of her ability to work in the business she was conducting* would seem to be a proper element of her damages for the injury which caused it. [Smith v. Railroad, 118 Mo. 246.] . . . Human nature is so constituted that physical labor in some form is essential to health and happiness and to be deprived of the *power to work* is one of the most serious personal injuries, *independent of the pecuniary benefits that such labor may confer,* and from any standpoint, whether of statute or common law, a married woman, like any other human being ought to be compensated so far as may be for such deprivation, if wrongful, and we do not think the court committed error in so holding in this instruction (on the measure of damages)." (Italics our own.)

But viewing the instruction (as appellant insists we must view it) as a direction to the jury to allow plaintiff compensation for *loss of earnings,* rather than for *impairment or diminution of the capacity to labor,* we believe that the giving of the instruction does not contitute reversible error, within the rulings and reasoning adopted by this court in several recent cases. [Laycock v. Railways Co. (en banc), 290 Mo. 344, 353; Gaty v. Railway Co. (Mo., en banc), 251 S. W. 61, 66; Leighton v. Davis (Mo., Div. 2), 260 S. W. 986, 989; Huhn v. Ruprecht (Mo., Div. 2), 2 S. W. (2d) 760, 763; Lindsay v. Kansas City, 195 Mo. 166, 170; Shinn v. Railways Co., 248 Mo. 173, 182.]

A period of fifteen weeks (lacking one day) elapsed between the date of plaintiff's injury and the filing of the present action. Assuming, as plaintiff testified, that he might have earned as much as $50 a week by the sale of artificial flowers had he been physically able to get about and solicit orders from customers, his maximum earnings during such period of fifteen weeks would aggregate $750, an amount less than that alleged in the petition as the amount of his loss of past earnings up to the time of the commencement of the action. The petition does not allege the amount of the loss of future earnings, but states that the amount of the loss of future earnings is unknown to plaintiff. While the instruction allows the jury to take into consideration plaintiff's disability in the future to engage in and conduct his business as a florist, and his future loss on that account, the instruction also told the jury that, after considering the

several elements of damage, the sum awarded by their verdict must be fair and reasonable under the evidence in the case. The holding of this court in the cases last cited is to the effect that, where no amount is alleged in the petition as the loss of future earnings, and the evidence tends to show that the amount of the loss of past earnings is less than the amount of such loss alleged in the petition, the giving of an instruction on the measure of damages similar to the one in the instant case does not constitute reversible error. Appellant cites in support of his contention the following cases: Finley v. Railways Co., 238 Mo. 6; Radtke v. Basket & Box Co., 229 Mo. 1; Smoot v. Kansas City, 194 Mo. 513; and Heinz v. Railways Co., 143 Mo. App. 38. Those cases are clearly distinguishable from the instant case. The point of distinction is fully discussed in the more recent decisions of this court, hereinabove cited, wherein the cases cited and relied upon by appellant are held to be inapplicable to the criticism made of the instruction in the instant case.

It is also claimed that the instruction is erroneous because it allowed a verdict for speculative damages, i. e., for loss of earnings from plaintiff's business, when there was no evidence from which to determine such loss. Plaintiff testified that he was not actually engaged in business at the time of his injury, having sold his floral shop, but that he was looking for a location to engage again in the business of florist. Over the objection of defendant that the testimony called for is speculative in character, the trial court permitted plaintiff to testify that his net income from the floral business (in which he previously had been engaged) averaged about $1000 a month in busy seasons, and averaged about $750 a month in dull seasons. The record before us discloses, however, that defendant did not except to the ruling of the trial court upon the objection made to such testimony, and no exceptions respecting such matter were saved and kept alive in the bill of exceptions, as set out in the record before us. Nor is there anything in the record to show that defendant requested of the trial court that such testimony be withdrawn or excluded from the jury. Plaintiff further testified, without objection from defendant, that, if he were able to get about and solicit orders for artificial flowers, he could earn from $25 to $50 a week. In view of the latter testimony, which was given without any objection whatever from defendant, we cannot say that there was no substantial evidence upon which to predicate the instruction. If defendant thought that the jury might be misled by the evidence just mentioned, or by plaintiff's instruction on the measure of damages, he should have requested an instruction withdrawing such evidence from the consideration of the jury, or advising the jury in more explicit language respecting the measure of plaintiff's recovery, or otherwise limiting the amount of recovery. Having failed to do so, defendant should not be heard to complain on appeal of said instruc-

tion on the measure of damages, given on behalf of plaintiff. [Jablonowski v. Mfg. Co., 312 Mo. 173, 196; Powell v. Railroad Co., 255 Mo. 420, 454; Laycock v. Railways Co., 290 Mo. 344, 357; Sang v. St. Louis, 262 Mo. 454, 463; Browning v. Railway Co., 124 Mo. 55, 72; Waddell v. Street Railway Co., 213 Mo. 8, 20; Hoover v. Railway Co. (Mo. Sup.), 227 S. W. 77, 79.]

We find no reversible error in the giving of plaintiff's instruction on the measure of damages.

III. Lastly, it is insisted that the amount of the verdict ($9,375) is excessive, and so grossly excessive as to call for a reversal of the judgment because of the bias and prejudice of the jury, which is said to be evidenced by the amount of the verdict. Although we believe the verdict is somewhat excessive in amount, we do not think it is so grossly excessive as to warrant a reversal of the judgment herein. While plaintiff suffered, as his chief injury, a fracture of the fibula, the smaller bone of the lower leg, near the knee, the testimony of the attending physicians is to the effect that the segments of the bone had united at the time of the trial, but that plaintiff still had some swelling and soreness in the region of the knee. The evidence tends to show that he was in the hospital for three weeks and confined to bed for about four months, and that he walked with the aid of crutches for about a year, but apparently he was able to get about with the aid of a cane at the time of trial. We find no evidence in the record of any shortening or deformity of the leg. While the evidence tends to show that plaintiff was incapacitated from pursuing his vocation of florist up to the time of the trial, there is no clear or positive evidence that his incapacity is likely to be permanent. In view of all the evidentiary facts disclosed by the record before us, and considering the elements of damage which the jury were allowed to take into account, we regard an allowance of $7000 as ample and fair compensation for the bodily injuries and the special damage suffered by plaintiff. Such allowance is measurably comparable with the allowances lately approved by this court in cases involving somewhat similar, but rather more serious, injuries. [Schupback v. Meshevsky, 300 S. W. 465; Brucker v. Gambaro, 9 S. W. (2d) 918; Corn v. Railway Co., 228 S. W. 78; Powell v. Railways Co., 226 S. W. 916.] However, decided cases are not controlling, but merely advisory, on the question of excessiveness of verdict, for it is impossible to lay down any hard-and-fast rules respecting the amount of compensatory damages which will govern every case. Each case must be ruled on its own peculiar facts, and the reasonable and sound judgment of the appellate court applied thereto.

If the plaintiff (respondent), within ten days from the filing of this opinion, will enter and file a *remittitur* in this court in the sum of $2375 as of the original judgment date, the judgment will be

affirmed as of its original date of entry for the sum of $7000; otherwise, the judgment will be reversed, and the cause remanded for retrial. *Lindsay* and *Ellison, CC.,* concur.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur.