George Leingang v. Geller, Ward & Hasner Hardware Company, a Corporation, Appellant.—73 S. W. (2d) 256.

Division Two, June 19, 1934.

*S. P. McChesney* and *Will B. Dearing* for appellant.

550

*Mark D. Eagleton* and *Allen, Moser & Marsalek* for respondent.

COOLEY, C.—This case, reassigned to the writer at the present term, is. an action for damages for personal injuries, in which plaintiff recovered judgment for $10,000, and defendant appealed. The sufficiency of the evidence to make a case for the jury is not challenged. The appeal presents questions concerning the nature and extent of plaintiff's injuries, the admission of certain evidence, the instructions and remarks of plaintiff's counsel in argument.

Plaintiff was an employee of defendant, a corporation operating a wholesale hardware establishment. His evidence tends to show that at the time of his injury on February 9, 1926, he was assisting in unloading wheelbarrows from a truck, his duty being to receive the wheelbarrows as they were lowered from the truck by the driver thereof. The wheelbarrows were piled high on the truck. The driver started to lower a wheelbarrow, weighing about seventy pounds, to plaintiff standing by the truck to receive it, when the driver, in obedience to a negligent order of defendant's foreman, dropped it. Plaintiff was not in position to receive it and had no time or opportunity to step back. It fell several feet and the end of a handle struck plaintiff in the upper left part of his chest, inflicting the injuries of which he complains. Plaintiff pleads his injuries thus:

"He suffered an internal hemorrhage and was caused to spit blood; a separation was caused between one of his ribs and the cartilage thereof; his ability to breathe was impaired; his lungs and pleura were affected; plaintiff developed chills and fever; and plaintiff has developed tuberculosis; that plaintiff's nervous system was severely injured; that plaintiff has suffered, is suffering and will in the future continue to suffer great bodily pain and mental anguish; that all of said injuries are serious and permanent; that all of the aforesaid parts and organs have been greatly and permanently weakened, impaired and rendered painful."

He testified that when struck he was knocked down and rendered unconscious for a little time; that he went home and by the time he reached the house was so weak and sick and the pain in his left chest and lung was so great that he could hardly "make it up the steps;" he was spitting blood; there was a bruise on his chest which later became black and blue. He returned to work next day and worked at light work for about five days, when he visited a Dr. Coryell, employed by defendant and to whom he was sent by the latter. Dr. Coryell sent him to a hospital to have an X-ray of his chest taken after which he again called on the doctor, who told him he "was kind of sprained and injured a little bit but not to amount to much;" gave him some kind of electrical treatment and bound his chest with tape; "that afternoon I took very sick, my fever went up and . . . I started to spit blood." Dr. Coryell treated him several days longer during which time he coughed and "spit up some blood." He complained to Dr. Coryell that he was badly hurt and tried to learn from him the nature and extent of his injury but

the doctor declined to tell him, referring him to the defendant. Mr. Fleischner, defendant's manager, only told him to do what the doctor directed. At Fleischner's suggestion he attempted to do some light work, but his fever and spitting of blood recurred and he became "real sick." He then consulted a Dr. Stucke, a physician of his own selection, who treated him for two or two and a half weeks and who took some X-ray pictures of his chest. He then consulted Dr. Owens, under whose care and treatment he thereafter remained. About November 25, 1926, at Dr. Owens' suggestion, he went west, remaining in New Mexico, Arizona and California until September, 1927, when he returned to St. Louis. While in California he worked a few months as chauffeur but had to give up the work, being unable to continue it or to do other manual labor because of his physical condition. He testified that prior to his injury he had been in good health, had never spit blood or had lung trouble of any kind and weighed 175 to 185 pounds; that at the time of the trial, April 3, 1928, he weighed 152 pounds, had night sweats which had begun about four months after his injury, and was still spitting blood and suffering from fever.

Dr. Stucke testified that he treated plaintiff from February 25 to March 15, 1926; that he found a separation of plaintiff's second rib from the cartilage that attaches it to the sternum, the second rib being near the apex of the lung; that the X-ray pictures he took showed some evidence of tuberculosis, a little more marked on the right than on the left side, but visible on both sides. He thought the tuberculosis was "quite far advanced," "of quite long standing." The pictures had been taken twenty-one days after the injury.

Dr. Owens testified that he began treating plaintiff March 27, 1926, and the latter had been under his care since that time; that when plaintiff came to him he found a partial separation of the second rib from the sternum "it was partially grown back by the fibrous gristle union, but the union wasn't firm at that time, and he also had what appeared to be a tubercular condition." He treated plaintiff for both conditions. Plaintiff complained of .pains in his chest. In answer to a hypothetical question Dr. Owens stated, without objection, that in his opinion, the blow received by plaintiff, as described in the question, could have "set up" the tuberculosis from which he found plaintiff suffering. He was then asked to tell how and started to answer—"In either of two ways. He might have had a dormant or latent or inherent condition, . . ." when he was interrupted by an objection from defendant that "latent tuberculosis or anything of that kind" was not within the pleadings. After some colloquy the court overruled the objection and the witness answered:

"He may have had inactive tuberculosis, what we call latent or inert, one that was not real active, and an injury to the chest might

have started that up, or started it up to an active condition. On the other hand, he may not have had tuberculosis at all as the result of this injury producing injury to the lung. On the other hand, again, as the result of injury to the lung, through the resulting inflammation to the lung he may have developed tuberculosis. We have tuberculosis germs in the air, in the dust all the time, more or less in our nose, mouth and throat, in fact, through the whole respiratory tract, and when conditions are favorable for its development it takes hold. If one is perfectly hale and hearty they might fight it off, but when conditions are favorable for it, then it takes hold and starts up a tubercular condition."

Defendant's counsel moved to strike out "all that part with reference to what is not in this petition."

"THE COURT: You mean with reference to there being a tubercular condition?

"MR. McCHESNEY: Yes, that there might be such a condition there?

"THE COURT: And that that condition was aggravated?

"MR. McCHESNEY: Yes, sir.

"THE COURT: I will sustain that motion and strike that part of it out. There is no evidence that the plaintiff knew that he had any tubercular condition at all. His testimony is to the contrary, so far as his knowledge is concerned. I will sustain the objection and the motion to strike that part of it out with reference to the latent or preexisting condition which was aggravated by this blow."

Dr. Owens further testified that a blow such as described could cause hemorrhages and the spitting up of blood; that it could cause "inability to breathe properly; that "There was a thickening of the chest wall at the point where this rib had been torn loose, and you could hear considerable moist rales throughout both lungs at the time I examined him, indicating some clogging up of the lung due to an inflammatory condition."

Dr. Owens further said that a blow such as that described might cause fever to develop "through setting up an inflammatory condition;" that the conditions from which he found the plaintiff suffering caused disability to him. He testified that in his opinion plaintiff would never get well or make any improvement in this climate.

Dr. F. G. Pernoud testified he examined plaintiff a few days before the trial; found a lump or mass of hard tissue, bone or cartilage, at the point where the second rib on the left side joins the breast bone and on examination of plaintiff's chest in connection with the history of the case was led to believe that plaintiff then had "an arrested case of tuberculosis." In answer to a hypothetical question he said the early hemorrhages may have been induced by the blow on the chest but that he did not ascribe the later hemorrhages to the blow.

"Q. What would you ascribe that to?· A. To the tubercular infection—

"MR. McCHESNEY (interrupting): I object to that and move it be stricken out.

"THE COURT: I will overrule the objection."

(To which ruling of the Court, defendant, by counsel, then and there duly excepted and still excepts.)

"MR. EAGLETON (Q.): Let me ask you something about tuberculosis, Doctor. Are there tubercular germs present in all of us at all times? A. We believe that they are present at all times in all individuals.

"Q. Does a blow of the kind I have mentioned, and trauma over the lung, does that weaken the lung and its surroundings so that tuberculosis can be set up, weaken the resistance of the lung, in other words?

"MR. McCHESNEY: I object to that; that is along the same line that we threshed out a little while ago in your Honor's chambers. I object to that because that goes right to the point where we had this misunderstanding on this petition.

"THE COURT: With the exception of the words 'Weaken its resistance, in other words,' I will strike that out of the question—otherwise he may answer."

(To which ruling of the Court defendant, by counsel, then and there duly excepted and still excepts.)

(Previous question read.)

"A. Yes.

"MR. EAGLETON (Q.): May a person have tuberculosis in a dormant, latent or inert stage and know nothing of it? A. Yes, and that is very, very frequently so. As a matter of fact the individual with tuberculosis only consults his doctor, unfortunately, when the disease is well advanced, and it often happens they go along with the disease for months and even years before a sufficient amount of distress develops that would indicate to them that something was wrong with them.

"Q. In other words, may a person have tuberculosis without cause—without sufficient symptoms to cause disability in manual pursuits? A. Yes, and that is often true. I know many people have tuberculosis and get well of it and never know of it.

"Q. I will ask you, Doctor, if you believe, aside from the use of the word 'tuberculosis,' and without using it, if you believe that hemorrhages of the kind I have described; continued after the reception of the blow over that lung in the region of the left chest, with fever and chills intermittently, if those items altogether, will cause a man to be disabled? A. They will.

"Q. I will ask you Doctor, where those matters·I have mentioned, without the use of the word 'tuberculosis,' have continued for a period of over two years, from February 9, 1926, to the present time,

over two years, whether or not they are reasonably certain to continue in the future, in your opinion? A. They will. But I would like to qualify that by saying that under proper medical supervision in a case of that kind—of course the question you put was a hypothetical question—but under proper medical supervision it is probable and possible that those symptoms may be completely abated.

"Q. In other words, as to what the future holds is a question that only time can tell; they can either be cleared up under proper medical attention, or may persist and the disease get worse; is that true? A. Yes, sir."

I. Appellant contends that the court erred in permitting plaintiff to prove by Dr. Pernoud "that 'the continued hemorrhages' were the result of a tubercular infection and that trauma weakens the lung and its surroundings so that tuberculosis can be set up," because conditions resulting from aggravation of a "preexisting or dormant condition are special damages not naturally arising from injuries complained of and must be specially pleaded before they can be proven." Relative to the testimony that the continued hemorrhages were due to tubercular infection defendant's objection and motion to strike out stated no grounds therefor and for that reason might have been properly overruled. It may well be doubted, also, whether the objection to the other testimony was sufficiently specific. It refers to something that transpired in the judge's chambers but which does not appear in the record. But if we treat the objections as sufficient in form we think they are not well taken. Appellant cites Hall v. Manufacturers' Coal & Coke Co., 260 Mo. 351, 168 S. W. 927, and like cases following it. In the Hall case plaintiff was allowed to prove that impotence had resulted from his injuries. He had alleged in his petition that "his body was severely and permanently wounded, bruised, contused, torn and mangled, both internally and externally, and that the bones, flesh and ligaments of his hips, pelvis, legs and ankle were broken, bruised, torn and mangled," and that as a result thereof he had suffered great pain and was disabled from attending to his business or doing anything to gain a livelihood and was crippled for life. This Court en Banc, in a divided opinion, held that the petition not only failed specifically to allege impotency but that it did not contain an allegation of a general nature which might be said to embrace within its terms the condition of impotency, and that it did not apprise the defendant that it would be called upon to meet the issue of such special damage, which might but would not necessarily result from the injuries described in the petition. In our opinion that case is not in point. The ailment there sought to be proved was considered foreign to the injuries alleged in the petition, as said in Costello v. Kansas City, 280 Mo. 576, 219 S. W. 386, 390 [8]. That cannot be said in the instant case. Plaintiff's petition alleges in-

jury to his lungs, that they have been greatly and permanently weakened, impaired and rendered painful, with other allegations of lung injury and that he developed tuberculosis. Certainly it cannot be said that defendant was not apprised by this petition that plaintiff claimed to be suffering from tuberculosis as a result of his injury. Appellant's argument seems to be that the petition would authorize proof only of tuberculosis originally caused solely by the blow received, but does not authorize evidence tending to prove that a prior latent or dormant condition, which plaintiff may have had (but which had never troubled him and which he did not even know existed) was quickened into life, called into active being, by the injury pleaded. We think such construction of the petition too narrow. One definition of the word "develop" given in Webster's New International Dictionary is:

"3. To unfold more completely; to evolve the possiblities or power of; to make active (something latent); to perfect; advance; further; to make to increase; to promote the growth of."

Suppose that, prior to his injury, plaintiff had had a tubercular condition that was dormant, inactive, "what we call latent or inert," to quote Dr. Owens, causing him no disability or inconvenience, and that such condition was brought to active life, developed into a disabling disease, by the injury he received. There can be no doubt that in such case he would be entitled to recover for such damage to his health and well being under a proper pleading, and we think the petition in this case sufficient to authorize evidence tending to show such situation.

For another reason we are inclined to think that the testimony of Dr. Pernoud that the blow and trauma described weakens the lung so that tuberculosis can be set up, was competent. The petition specifically charged weakening of the lung and development of tuberculosis. Plaintiff testified that he had never had any lung trouble prior to his injury. There was evidence that after the injury he had tuberculosis; that there are tuberculosis germs in the air and in the respiratory tract at all times, not inimical when a person is hale and hearty but which "take hold" when conditions are favorable for development of disease. Dr. Pernoud in effect so testified. The weakening of the lung "so that tuberculosis can be set up" was a circumstance which the jury might consider in determining whether it had been so set up in this instance.

■ II. Appellant charges error in the giving of plaintiff's Instruction No. 5, reading as follows:

"The court instructs the jury that if under the evidence and other instructions of the court you find in favor of the plaintiff, and further find that at the time plaintiff met with his injuries he was then suffering from some form of tuberculosis, this fact alone does not prevent plaintiff from recovering in this case, but you will

allow him for all injuries, if any, you find from the evidence plaintiff has suffered as a direct result of such injury, if any, sustained on the occasion in question in accordance with Instruction No. 7."

Appellant's criticism of this instruction is that it allows recovery of damages for injuries not pleaded, thus broadening the issues made by the pleadings. It appears from appellant's printed argument that the alleged unpleaded injuries complained of are the continued hemorrhages and the prior latent or dormant tubercular condition referred by Dr. Pernoud in his testimony above set out. The instruction specifically limits plaintiff's recovery to the injuries (damages?) which the jury should find *from the evidence* plaintiff suffered as a *direct result* of such injury, if any, sustained on the occasion in question. Plaintiff's evidence tended to show that he had never prior to his injury in question had hemorrhages or spit blood, all of which he contended was due to said injury. The "continued hemorrhage" as well as that immediately following the accident is embraced in the allegation of the petition on that subject. We have held in paragraph I that the evidence relative to the quickening into life of a dormant tubercular condition, if such existed, is within the scope of the petition. There was no evidence of any injuries which, in our judgment, were not sufficiently pleaded. If the jury followed the instruction they could not have awarded damages for any injury not pleaded. The instruction did not broaden the issues made by the pleadings. An instruction of like tenor was given in Smart v. Kansas City, 208 Mo. 162, 105 S. W. 709. It was assailed "because the petition alleges that the amputation of plaintiff's leg was caused by the fall received on the sidewalk, while the instruction permitted the jury to consider it as an aggravation of existing ailments." [208 Mo. l. c. 181, 206, 105 S. W. 709.] The objection was held untenable. [See, also, Brown v. Hannibal & St. Joseph Ry. Co., 66 Mo. 588; Herndon v. City of Springfield, 137 Mo. App. 513, 119 S. W. 467; Mahany v. Kansas City Rys. Co. (Mo.), 254 S. W. 16, 21 (6).]

III. We take next appellant's contention that certain remarks of plaintiff's counsel in argument to the jury were prejudically improper. This question is closely related to the matters discussed in paragraphs I and II hereof. Counsel for plaintiff referred to the testimony of Dr. Coryell to the effect that in the X-ray pictures taken at his direction five days after the accident he found no indications of anything abnormal, and Dr. Stucke's testimony that, in the pictures he took he found indications of a disease of the lungs. This followed:

"MR. EAGLETON: . . . Now, the Court tells you in two separate instructions what difference does it make, if this plaintiff by reason of this injury is caused to have a disease, by whatever name

that disease is known; I don't care whether they call it tuberculosis or what not; we are not concerned with that, and you are not concerned with that—

"MR. MCCHESNEY (interrupting): Wait a minute; I object to that; that is going too far.

"THE COURT: I will overrule the objection.

"MR. MCCHESNEY: Note my exception to the ruling of the Court."

In this connection it should be stated that the court had given at defendant's request an instruction, No. 6, withdrawing from the jury's consideration the "allegation of damage that tuberculosis developed" and directing the jury not to consider same or any statements of counsel or witnesses "with reference to tuberculosis." From what we have said in paragraphs I and II it is apparent that said Instruction No. 6 went too far and was too favorable to defendant. But plaintiff's instructions properly permitted recovery of damages shown by the evidence to have been suffered by plaintiff as a direct result of the injury sustained on the occasion in question. That necessarily included the weakened and diseased condition of plaintiff's lungs which his evidence tended to show, if it resulted directly from said injury. Defendant's objection was vague. It stated no reason for the claim that the argument went too far. But regardless of the insufficiency of the objection we think that under the circumstances the argument complained of was not prejudicially improper.

■ IV. Appellant complains of paragraph 3 of plaintiff's Instruction No. 7 on the measure of damages. Said Instruction No. 7 directs that if the jury find for the plaintiff, "then in assessing his damages you will allow him such sum as you find and believe from the evidence will fairly and reasonably compensate him. . . . 3. For such loss of earnings, if any, plaintiff has lost by reason and on account of his injuries, if any, sustained on the occasion in question." The contention is that the petition limited such loss of past earnings to $18 a week, wherefore the instruction should have so limited the recovery for loss of past earnings. On this point the amended petition on which the case was tried charged: "That plaintiff's ability to work or obtain employment has been greatly and permanently weakened and impaired; that plaintiff has lost and will in the future continue to lose all or the greater part of his earnings; that at the time of his injury plaintiff was earning approximately eighteen dollars ($18) per week." There is no further allegation relative to loss of past earnings. We think this contention well founded. Plaintiff was permitted, over the objection of defendant, to testify that his regular employment prior to his injury had been that of cement finisher at which he had earned $2500 a year and that his employment by defendant was only temporary,

sought and obtained by him because of temporary inactivity in his regular line of work. But his amended petition on which the case was tried did not apprise defendant of such claim. He therein stated merely that "on and prior to the 9th day of February, 1926, (the alleged date of his injury) he was in the employ of" the defendant, and then proceeded to state the manner in which he was injured. The petition does not indicate a claim that prior to his injury plaintiff had followed a more remunerative employment and had lost the earnings of such employment. We think the fair and reasonable construction of the petition is that plaintiff therein claimed to have lost the earnings of the only employment he therein referred to, which he fixed at $18 per week. Otherwise what was intended and what office is performed by the allegations that at *and prior* to the date of his injury he was employed by the defendant and at the time of his injury was earning $18 per week?

In Laycock v. United Raiyways Co., 290 Mo. 344, 353 et seq., 235 S. W. 91, the court en banc discussed a petition which alleged:

"Plaintiff says, *that prior to his injury aforesaid,* he was engaged in the business of buying and selling brooms at wholesale, and was a salesman of merchandise to the retail trade, and earned an average of five dollars per day; that since his injury, he has been unable to attend to his business, and has lost his earnings; that his earning power has been permanently impaired; that he will continue to lose the earnings of his business; that he will be permanently unable to follow his former business, or any other business."

In that case it was contended that the petition limited both past and future earnings to five dollars a day. The court held that it put no limit on future earnings but limited the claim for loss of past earnings *prior to the filing of the petition* to an average of five dollars per day. The court approved and quoted from Jackson v. United Railways Co. (Mo. App.), 227 S. W. 617, holding that a similar allegation limited the loss of past earnings prior to the time of filing the petition but did not limit the loss of future earnings. In the Jackson case the allegation of the petition was: "She has lost the earnings of her labor and avocation to the date of the filing of this petition, to-wit, in the sum of $14 per week, which she was earning at the time of her injuries, and will lose such earnings in the future." [See, also, Bible v. St. L. & S. F. Ry. Co., 169 Mo. App. 519, 154 S. W. 883; Lindsay v. Kansas City, 195 Mo. 166, 93 S. W. 273.] We see no substantial difference between the allegations of the petition in this case and those of the petition construed in the Laycock case. Following the latter case we hold that plaintiff's petition fixes the amount claimed by him for lost earnings from the time of his injury to the filing of his amended petition at an average of eighteen dollars a week. Paragraph 3 of the instruction was therefore erroneous in directing the jury to allow for all loss of past

earnings shown by the evidence, since there was evidence, introduced over defendant's objection, from which the jury may have found loss of past earnings in excess of the amount claimed in the petition.

We are of the opinion, however, that the error can be cured by *remittitur*. That course was not permitted in Smoot v. Kansas City, 194, Mo. 513, 92 S. W. 363. It does not appear from the opinion in that case what the evidence showed as to the value of the time the plaintiff had lost. The court held that upon the disclosures of the record and under the circumstances there shown the ends of justice would best be served by remanding the case for new trial. It recognized however that a *remittitur* may properly be permitted "where the court can reasonably estimate the excess in the verdict or judgment and that it is apparent that no injury can be done the defendant by entering such *remittitur*." [194 Mo. 1. c. 523, 92 S. W. 363.]

In Radtke v. St. Louis Basket & Box Co., 229 Mo. 1, 129 S. W. 508, cited by appellant, the court refused to permit a *remittitur*, citing the Smoot case and others, but in the Radtke case the court stressed the fact that the petition placed a limit on the amount claimed for loss of future as well as past earnings. It said, 229 Mo. 1. c. 21, 129 S. W. 508: "In the case at bar, the loss by injury to earning capacity was not only fixed from the date of the injury to the date of filing the petition at nine dollars per week, but it was fixed at such sum for the future." Finley v. United Railways Co., 238 Mo. 6, 141 S. W. 866, is similar to the Radtke case, which it cites and follows.

In Laycock v. United Railways Co., supra, it was held that the instruction there in question, which did not limit the recovery as to either future or past loss of earnings, was not erroneous because as to future earnings the petition fixed no limit and as to past earnings the evidence showed the plaintiff's loss to have been *less* than the amount claimed in the petition. The court held that, absent anything to the contrary appearing, it must be presumed that the jury obeyed their oaths and the court's instructions and based their verdict on the evidence. Therefore, since the evidence showed less lost earnings than the amount limited in the petition the jurors were presumed to have followed the evidence and allowed for that item of damages the amount so shown which was within the amount named in the petition. Applying that principle here the jury could not have awarded for loss of earnings from the date of plaintiff's injury to the filing of his amended petition more than $2,500 a year because that is the maximum amount shown by the evidence. Plaintiff was injured February 9, 1926. He filed his amended petition, in which for the first time he asserted loss of earnings as an element of damages, October 4, 1927, one year, seven months and twenty-five days later. At the rate of $2,500 a year he would have earned in that time

$4,132. At $18 a week, the amount claimed, he would have earned $936 a year or $1,547 for the whole time. That sum represents the total amount of lost earnings claimed by plaintiff up to the filing of his amended petition, as limited by the allegations thereof. But plaintiff's evidence shows that during that interval he earned $225 as a chauffeur. That sum must be deducted from the $1,547, leaving $1,322, as the loss of past earnings he was entitled to recover under the allegations of his petition. There was some evidence indicating that he had attempted selling secondhand automobile tires but no showing that he had made any money at it.

Assuming, as we must in fairness to the defendant, if a *remittitur* is to be allowed, that the jury may have awarded plaintiff for lost earnings prior to the filing of his amended petition $2,500 a year, which he testified was his average yearly earning prior to his injury, the verdict was excessive on said item of lost earnings by the difference between said sums of $4,132 and $1,322,—that is $2,810. We are satisfied that to permit a *remittitur* of that amount, on the record before us, rather than to remand the cause for new trial, can work no wrong to the defendant and will best serve the ends of justice.

There is earnest contention by appellant that the verdict is excessive aside from the question of lost earnings. While on the whole evidence, which we have sketched only from the standpoint favorable to plaintiff, the verdict appears to us liberal, we would not feel justified in requiring a *remittitur* but for the error in Instruction No. 7 above noted. With the above indicated *remittitur* entered we think the judgment sufficiently supported by the evidence.

The judgment is affirmed upon condition that plaintiff, within ten days, remit said sum of $2,810 thereof as of the date of the judgment in the circuit court; otherwise it is reversed and the cause remanded. *Westhues* and *Fitzsimmons, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All the judges concur.