GEORGE A. DODSON v. GATE CITY OIL COMPANY, Appellant.—88 S. W. (2d) 866.

Court en Banc, December 19, 1935.

*Chas. M. Howell, Edgar Keating, Chas. M. Howell, Jr., Wm. H. Allen* and *Scott R. Timmons* for appellant.

186

*W. H. Senner* and *Madden, Freeman & Madden* for respondent.

COOLEY, C.—Action for damages for personal injuries. Originally there were two defendants, the Kansas City Public Service Company, a corporation operating a street car system in Kansas City and the Gate City Oil Company, a corporation engaged in the sale and distribution of gasoline, oil and other commodities in said city. At the close of plaintiff's evidence the court sustained a demurrer as to the Public Service Company and plaintiff thereafter dismissed as to that defendant. The case proceeded against the defendant Gate City Oil Company and plaintiff obtained judgment for $27,500 from which that defendant appealed. Reference hereinafter to the defendant will mean said Gate City Oil Company.

Plaintiff was injured while riding as a passenger on a street car of the Public Service Company, January 8, 1929, when a large oil truck of defendant collided with the rear end of the street car. The street car was going south on Summit Street, a north and south street, with the truck following it. As it was stopping or had just stopped to discharge passengers at the north side of Thirty-eighth Street, an east and west intersecting street, the truck, which had been following it for two blocks, crashed into the rear end of it. The car was crowded with passengers and plaintiff, unable to find a seat, was, with several others, standing in the rear vestibule of the car when the collision occurred. The vestibule was enclosed at the rear with sheet metal extending part way from floor to roof, attached to and strengthened by upright iron rods. Above the metal part of the rear enclosure were windows. At the time of the collision plaintiff was leaning, as he had been theretofore, against said rear metal enclosure, a little to the right of the center thereof, with his back toward the truck, which he had not seen. The force of the impact of truck against car smashed in the metal part of said rear enclosure a distance variously testified to as six to ten inches, at the point where plaintiff was leaning against it, breaking the upright irons loose from their floor fastenings and shattering the glass of the windows. Plaintiff was thrown or knocked forward onto the floor and as he claims, severely injured.

Plaintiff's petition contained several specifications of negligence, only one of which was submitted to the jury, viz.—that defendant, through its agent, the truck driver, "knew or in the exercise of the proper degree of care could have known that the street car with the plaintiff therein was in the pathway of said truck in a position of imminent peril in time thereafter for the driver of said truck, acting, as aforesaid, to have stopped said truck, slackened its speed, (or) swerved the same . . . and thereby have prevented said collision, but that he negligently failed to do so."

■ The other specifications of negligence charged excessive speed, failure of the driver to keep a vigilant watch for vehicles ahead of him and to observe the street car as he approached it and failure to give warning of his approach, but plaintiff did not ask to have those specifications submitted. Appellant insists that the evidence did not warrant submission of the case on the charge of negligence above quoted.

The evidence, considered as it must be on this issue in its light favorable to plaintiff, tended to prove the following:

The collision occurred at about six o'clock P. M. Summit Street, between Thirty-eighth and Thirty-seventh streets, an east and west street one block—three hundred feet or more—north of Thirty-eighth, was covered with snow three or four inches deep. The snow had been swept from the part of the street occupied by the car tracks sufficiently to make a traffic lane for street cars and motor vehicles, but the car tracks and pavement were slippery from the snow and ice. From Thirty-seventh to Thirty-eighth streets there is a gradual downward slope. Both Thirty-seventh and Thirty-eighth streets were regular stopping places for street cars as defendant's driver knew, southbound cars stopping regularly at the north side of each of said streets. The car had made its regular stop at Thirty-seventh Street and the truck, which had then been following it for a block or two, had stopped or "slowed down to very slow" behind it, safely, going forward behind the car when the latter proceeded. The car was well lighted and defendant's driver could see that it was loaded with passengers and could see plaintiff and other passengers standing in the rear vestibule. Between Thirty-seventh and Thirty-eighth streets the car ran at the rate of ten or twelve miles an hour until it began slowing down for the Thirty-eighth Street stop. The truck, after the car had started from Thirty-seventh Street and had gotten some distance ahead of it, was running fifteen miles an hour. The car began slackening speed for the Thirty-eighth Street stop when forty or fifty feet from the point where the collision occurred and had just come to a stop when the truck struck it. When the car began slackening speed for the stop the truck was approximately fifty feet behind it, still running at fifteen miles an hour. The truck did not strike head on. The driver swerved the front end to the right, missing the car, but the rear wheels skidded,— some evidence, especially defendant's, indicating on account of ruts along the car track formed by snow and ice,—and the body of the truck struck the car. The truck came to a stop with the front end about even with the doors of the rear vestibule of the car. Plaintiff's evidence tended to show that the truck struck the car with great violence. Defendant's evidence tended to minimize the force of the collision.

L. S. Haggard, the driver of the truck, was called as a witness by

defendant. He testified that the truck and its brakes, tires and appliances were in good condition; that at the time in question he knew the *locus in quo,* the downward grade from Thirty-seventh to Thirty-eighth streets, and the slippery condition of Summit Street due to the snow and ice; knew that the street car customarily stopped at Thirty-eighth Street and expected it to stop, as it did, on this occasion; that when the car stopped at Thirty-seventh Street he had "slowed down to real slow" and then moved on as the car moved on; that street conditions were practically the same at the Thirty-seventh Street stopping place as between Thirty-seventh and Thirty-eighth streets, except that at Thirty-seventh Street the grade was about level; that he was approximately fifty feet behind the car, when the latter "began to stop" and that the car thereafter moved fifteen or twenty feet farther before coming to a standstill; that he had picked up speed in the block between Thirty-seventh and Thirty-eighth streets and when fifty feet behind the car was traveling about fifteen miles an hour; that he made no effort to slacken his speed or to swerve or stop until he was about seventy feet and the street car fifteen or twenty feet from the point of collision, the vehicles being in those relative positions when the car, which he had been watching, began slackening its speed for the Thirty-eighth Street stop; that he then first applied his brakes, gradually, but without appreciable effect; that his wheels slipped on the icy pavement, resulting that the speed of his truck slackened but little if any in the next fifty feet; that when he was about fifteen or twenty feet from the point of collision he shifted his gears to second speed, which corresponded to first speed on an automobile, his truck having four forward speeds; that he accomplished the change of gears without difficulty; that in the fifteen or twenty feet of space between the point where he changed gears and the point of collision he reduced his speed from fifteen miles to about eight miles an hour, at which rate he estimated his truck was moving at the moment of the collision. He testified in effect that in his judgment under the existing conditions and with the means and appliances at hand he could have stopped in twenty-five or thirty feet. He said on cross-examination:

"Q. Now, in what distance could you stop your truck as you were going down there? A. Well, it would stop in from twenty-five to thirty feet.

"Q. Going at fifteen miles an hour? A. On a solid footing.

"Q. But wasn't it all about the same going down there? A. Practically, yes, about the same.

"Q. Practically all the same condition—the ice, I mean, was about the same all along there? A. Yes, sir.

"Q. So your judgment was that you could have stopped in about twenty-five to thirty feet? A. Yes, sir."

After several more pages of cross-examination relative to the con-

dition of the street, his efforts to stop and when they began, etc., this question was asked and answer given:

"Q. Do you still say that under all the facts and conditions and circumstances, that you could have stopped your truck in twenty-five to thirty feet, with the appliances you had on that truck? A. I had been doing it."

He said that when he was seventy feet back of the point of collision he knew he was losing control of his truck because the wheels were slipping. He had previously said there was snow eighteen or twenty inches deep to the right of the car track where it had been swept in clearing a traffic way. Asked why he did not turn out into that snow, if necessary to prevent a collision, when he realized he was losing control of his truck, he at first said there were some cars parked along there, but on being pressed concerning that matter admitted that the parked cars were in the block north of Thirty-seventh Street and that he had noticed none in the block between Thirty-seventh and Thirty-eighth streets, and finally said he could not explain why he had not swerved his truck to the right. Neither had he noticed any northbound traffic to prevent his swerving to the left if necessary to prevent running into the car. He further testified that he realized there was danger of a collision when he was at least one hundred and twenty feet from the point of collision. He admitted that in a deposition given before the trial he had been asked if he did not know before he had gone very far from Thirty-seventh Street that there was danger of a collision and had replied: "Yes, before I began to catch up with the street car, while the street car was traveling the seventy feet, I knew that there was danger." This followed at the trial:

"Q. Now, as the street car started in to travel that last seventy feet that you speak about, how far were you behind it at that time? A. About fifty feet.

"Q. So you were at least one hundred and twenty feet from the point of the collision when you realized that there was danger of a collision? A. Yes, sir."

Later, however, after some questions (perhaps suggestive) on that subject by counsel for defendant, he said, in answer to a further question on recross-examination that when he said he realized there was danger when the street car began to travel "that last seventy feet before the collision" and he was fifty feet behind it he meant the last seventy feet that he traveled.

It is admitted that at the time in question Haggard was defendant's employee, acting in the course of his employment, and that defendant is responsible for his negligence, if any. There is no contention that plaintiff was guilty of contributory negligence.

At the instance of plaintiff the court gave the following instruction, No. 1. "The court instructs the jury that the driver of a truck was

at the time and place in question bound to exercise in the specific respects hereinafter mentioned the highest practicable degree of care in the operation of said truck, and, if, therefore, you find and believe from the evidence that the street car in question was in the pathway of the said truck and that there was imminent danger of collision therewith, if you so find, and that the driver of the said truck knew or in the exercise of the highest practicable degree of care could have known that said car was in the pathway of said truck and that there was imminent danger, if any, of collision therewith, if so, and thereafter said driver in the exercise of the aforesaid care could have stopped said truck, slackened its speed or swerved said truck and thereby have avoided said collision, but that he failed to do so, then said driver was negligent, and if, as a direct result of said negligence, if any, said collision resulted and that the plaintiff was thereby injured, then your verdict should be in favor of the plaintiff and against the defendant Gate City Oil Company.

"The highest practicable degree of care, as defined in these instructions, is that degree of care, which a very careful and prudent person ordinarily exercises under the same or similar circumstances and that 'negligence' or 'negligent,' as used in these instructions, is the failure to exercise the highest practicable degree of care."

Appellant urges several objections to said instruction, the first being, as above mentioned, that the evidence did not warrant submission of the case on the theory therein embodied, viz., that the driver could have averted the collision and injury to plaintiff after he knew or should have realized that there was imminent danger thereof.

Appellant contends that the evidence, in its light most favorable to plaintiff, establishes "that there was no danger to the plaintiff until the moment the street car began slowing down and the truck driver began to apply his brakes some fifty feet to the rear of the street car . . . that plaintiff's peril did not become imminent nor was there imminent danger of a collision until the truck had been swerved to the right and the rear wheels caught in the ruts, at which time the truck was hopelessly out of control," and further that "even though it be considered that plaintiff's position became imminently perilous at the point where the truck driver first applied his brakes, any danger to the plaintiff arose solely from the fact that the truck was out of control and the driver could not arrest its forward movement." This argument, we think, overlooks the fact that there was evidence from which the jury could find that the driver did not begin making efforts to stop or to slacken his speed and put his truck under control when he first knew or in the exercise of the high degree of care incumbent upon him should have realized there was imminent danger of a collision unless he did so, and the further fact that the jury may have found he could have avoided injuring

plaintiff by exercising due diligence after he first applied his brakes. He knew the grade and the condition of the street, and expected the car to stop where it did. When fifty feet behind it and until it began slackening speed for the stop he was traveling faster than the car. He testified that when he first applied his brakes he was seventy feet from the point where the car stopped and the collision occurred. He was then still going fifteen miles an hour. True he also said that it was then the car began slowing down for the stop and that it was only fifteen or twenty feet from its stopping place. But the motorman testified that the car was forty or fifty feet from said stopping place when he began slowing down for the stop. The jury therefore could have found that the truck driver continued at his speed of fifteen miles an hour for some twenty-five or thirty feet after the car began slowing down before he applied his brakes. Also said driver at one time testified positively that he realized the danger of a collision when he was one hundred and twenty feet from the point of collision, which would mean that he traveled still farther after such realization before applying his brakes. He later qualified the latter testimony but the jury may have believed the testimony as he originally gave it at the trial and admitted having given it in his deposition rather than his subsequent statement as to what he had meant by it. Moreover, regardless of what he, defendant's witness, said as to when he first knew there was danger it was a question for the jury whether or not, in the exercise of due care, under the existing conditions and circumstances, which he knew, said driver should have realized the imminence of a collision unless he took steps to avert it and the probable consequent injury to passengers on the car in time thereafter, by exercising due care, to have controlled his truck and avoided running into the car. In this connection we may well paraphrase what was said by this court in Spoeneman v. Uhri, 332 Mo. 821, 828, 60 S. W. (2d) 9, 12 ▮ thus: We are not called upon to say precisely when plaintiff's peril arose, for, since the presence of the street car was apparent, its progress uniform and the likelihood of its stopping known to defendant's driver, it was the latter's duty to refrain from running into it and to adopt measures to that end as soon as necessary. The case is not like one where a person suddenly enters a danger zone, or where the driver of a vehicle has the right to assume a person will stop before going into a position of peril. What the street car, with plaintiff therein, was doing and what it would do were evident.

Other facts must also be considered. Haggard testified that when he applied his brakes seventy feet from the point of collision his wheels slid, the truck continued to move forward with speed but little, if any, diminished, and he realized he could not control it with the brakes. He could shift his gears quickly and easily. He did so later, but not until he was within fifteen or twenty feet of

the point of collision. According to his testimony he had slid forward some fifty feet before shifting gears. By shifting the gears he reduced his speed from fifteen to eight miles an hour in the short space of fifteen or twenty feet. The jury may have found that in the exercise of due care he should have resorted to that means of control sooner when he discovered that he could not control the truck with the brakes and that he could thus have averted the collision or so minimized its force as not to injure plaintiff. And he gave no satisfactory explanation for his failure to swerve out from behind the car sooner than he attempted to. It appears from his testimony that he did not attempt to swerve until after he had shifted gears, when he was almost to the car.

It is further urged that the instruction was erroneous in that it submitted failure to slacken speed whereas appellant says there was no evidence that slackening the speed of the truck could have averted plaintiff's injury. It is common knowledge that under the conditions herein shown a motor vehicle such as the truck in question is more difficult to control going at fifteen miles an hour than if it was traveling more slowly. [See Cox v. Reynolds (Mo. App.), 18 S. W. (2d) 575, 578 (4); Allison v. Dittbrenner (Mo. App.), 50 S. W. (2d) 199, 202 (1-3).] Appellant argues that plaintiff's position did not become imminently perilous until the truck driver had lost control of the truck, after which he could not arrest its forward movement; in effect, that the collision and plaintiff's injury were due to such loss of control of the truck. The jury may have found that a timely reduction of speed after the driver knew or in the exercise of due care should have realized the danger of collision would have prevented that loss of control and enabled the driver to stop or swerve in time to avert the collision or to have so minimized the force thereof as not to injure a passenger on the car. If the collision was directly due to the driver's loss of control of the truck, and that loss of control was due to said driver's negligent failure to put or keep his truck under control after he knew or should have known that there was imminent danger of a collision unless he did so it certainly cannot be said that such failure was not a cause of the collision. It must be borne in mind that the driver testified that he realized there was danger of a collision when he was one hundred and twenty feet from the point where he expected the car to stop and where it did stop; and further that, regardless of his testimony, the jury could have found from all the circumstances that in the exercise of due care he should have realized before he claims he began to act that there was imminent danger of such collision unless he took timely steps to prevent it. It was his duty to take steps to put and keep his truck under control, so as to be able to stop if necessary, as soon as he knew or in the exercise of proper care should have known of the danger imminent unless he did so.

Moreover, it is inferable that at the Thirty-seventh Street intersection he avoided striking the car by slackening his speed without actually stopping. He said he "slowed down to real slow" and then moved on as the car moved on. A similar procedure at Thirty-eighth Street, which would have been possible had the truck been under control, would have averted the collision, without actually stopping. We think the question of whether or not the driver was guilty of negligence which became a proximate cause of the injury in failing to slacken speed after he knew or should have known of the danger of a collision, as well as that of his negligence *vel non* in failing to stop or swerve the truck, was for the jury.

█ It is contended that said instruction does not require a finding that the plaintiff was in peril and that the truck driver knew or should have known it, but only that the *street car* was in danger of being struck, and erroneously assumes that if the driver knew the street car was in danger from his truck he knew of plaintiff's peril. He knew the car was filled with passengers. That plaintiff was one of those passengers is admitted. If the driver negligently ran into the car and such negligent act was likely to and did injure a passenger it was not necessary in order to establish liability that he should have known which particular passnger would or might be injured. As said by this court en banc, in Myers v. Kennedy, 306 Mo. 268, 280, 267 S. W. 810, 814 (2-4): "If the situation he could see was such that one using due care ought to have anticipated injury by the course he was taking, then it was not necessary that he should be able to foresee a particular injury, or injury to a particular person or thing." [See, also, Miller v. K. C. Rys. Co. (Mo.), 233 S. W. 1066, 1067 (1); Lyons v. Metropolitan Street Ry. Co., 253 Mo. 143, 158, 161 S. W. 726; McCray v. M., K. & T. Ry. Co., 321 Mo. 17, 10 S. W. (2d) 936, 938; Moordale v. Park Circuit & Realty Co. (Mo. App.), 58 S. W. (2d) 500, 502 (3-6).] In Montague v. M., K. & T. Ry. Co., 305 Mo. 269, 282, 264 S. W. 813, 817, (6), an instruction similar on this point to that in the instant case was approved though not assailed on this ground.

Appellant says that the instruction, in directing that if the jury found that the driver "in the exercise of the aforesaid care could have stopped," etc., and failed to do so, he was negligent, assumes negligence on his part. This particular criticism seems to be based on the contention that saying to the jury that if the driver in the exercise of due care could have stopped and failed to do so he was negligent implies or assumes that he did not exercise such care. Appellant cites Zini v. Terminal Railroad Assn. (Mo.), 235 S. W. 86, and Glaser v. Rothschild, 221 Mo. 180, 80 S. W. 332. In the Glaser case the expression condemned as assuming or implying failure to use the requisite care was "that had plaintiff been in the exercise of ordinary care, he would have detected the depression, and

would have avoided falling.'' In the Zini case similar language was used and was disapproved, the court citing and following the Glaser case. In Ward v. Missouri Pacific Ry. Co., 311 Mo. 92, 277 S. W. 908 (en banc), language in an instruction similar to that used in the instant instruction was held not to assume but to require a finding of negligence. The Glaser and Zini cases were referred to and distinguished. As in the Ward case the instruction in the instant case required the jury to find the facts which constituted negligence. This criticism of the instruction is not sound. On this point see, also, 'O'Leary v. Scullin Steel Company, 303 Mo. 363, 385, 260 S. W. 55, 62.

■ Said instruction is further claimed to be fatally defective on the ground that it does not require a finding that the truck driver could have stopped, swerved or slackened the speed of his truck with the means at hand. It does not so state in specific terms but it does so require in effect and by necessary implication. It specifically requires the jury to find, in order to convict him of negligence, that in the exercise of the care required of him, which is defined, he could have stopped, swerved or slackened speed and thereby have avoided the collision. It is obvious that if he did not have at hand the means with which to stop, swerve or slacken speed he would not be guilty of negligence or want of due care in failing to do so. No juror could have understood, under that instruction, that he was required to use means of averting the collision that he did not have at hand. In Spoeneman v. Uhri, supra, it was held that an allegation in a petition that the driver of a motor vehicle in the exercise of ordinary care could have avoided injuring the plaintiff by stopping, retarding speed or swerving, implied that he could have done those things with the means at hand; otherwise he could not have done so in the exercise of ordinary care. We do not mean to say that an allegation which would be sufficient in a pleading would always be sufficient in an instruction. But in this case all the evidence relating to stopping, swerving or slackening the speed of the truck or to avoidance of the collision by the truck driver had reference to doing so with the appliances at hand. The driver's testimony was that those appliances were in good condition. There was no suggestion in the evidence that he should or could have used any other means. No juror could have understood that in the exercise of due care he was required to do so. The omission of a specific statement in the instruction that he was required only to use the means at hand could not have been prejudicial in this case. The jury could not have been misled thereby. In Hart v. Weber (Mo.), 53 S. W. (2d) 914, an instruction similar in this respect to that in the instant case was held sufficient, though not assailed on this particular ground. [So also in Stewart v. Kansas City Public Service Co. (Mo. App.), 49 S. W. (2d) 1061; Ennis v. Union Depot, 155 Mo. 20, 55 S. W. 878; Kinlen v. Metropolitan Street Ry. Co., 216 Mo. 145, 161, 115 S.

W. 523; Taylor v. Metropolitan Street Ry. Co., 256 Mo. 191, 206, 165 S. W. 327.] In Clark v. Mo. Pac. Ry. Co. (Mo. App.), 40 S. W. (2d) 509, an instruction similar in this respect to the one here in question was held to require, by implication, a finding that the train could have been stopped with the means at hand. As to whether or not the driver could have timely stopped, swerved or reduced the speed of his truck with safety to himself and his vehicle was not a contested issue, Robison v. Chicago Great Western Ry. Co. (Mo. App.), 66 S. W. (2d) 180, 192 (28-30), and appellant does not assail it for omitting that element. The omission here complained of did not constitute prejudicial error.

■ Appellant complains that the instruction assumes other controverted facts, viz.: That the driver could have stopped, slackened speed or swerved; that the collision would have been averted had he so done; that he failed to do so; and that such failure was negligence. As to the first three of said alleged assumptions it is clear from a reading of the instruction that it does not assume but requires the jury to find said facts. In the beginning the instruction tells the jury that *if they find and believe from the evidence,* that, etc., and then proceeds to enumerate the facts to be found. It clearly requires a finding of all the enumerated facts which follow the phrase "if you find and believe from the evidence." It is not necessary that such or a similar phrase be repeated in juxtaposition with each of the several enumerated facts. As to the alleged assumption that the failure to stop, slacken speed or swerve was negligent, the instruction merely declares the legal effect of the facts hypothesized if the jury finds those facts to exist. Such facts, if found, constitute negligence. In such circumstances, as was said in Oglesby v. St. L.-S. F. Ry. Co., 318 Mo. 79, 95, 1 S. W. (2d) 172, 179, "It is not necessary to require the jury to add to its finding of the facts an additional finding that such facts constitute negligence. The law draws the conclusion in such cases."

■ Appellant assails plaintiff's Instruction No. 2 reading as follows:

"The court instructs the jury that if you believe and find from the evidence that defendant Gate City Oil Company was negligent as defined in other instructions and that such negligence, if any, caused the collision in question, and that plaintiff was injured as a direct result of said negligence, then the defendant Gate City Oil Company is responsible for all the ill effects, if any, which were the direct, natural and necessary result of such negligence in the condition of health in which the plaintiff was at the time of the injury (if any), and you are instructed that it is no defense that the injuries resulting from said negligence, if you find they did, may have been aggravated or rendered more difficult or impossible to cure by reason of the weakness of the union of the bones of plaintiff's

right hip, due to an old fracture, if you find he had such weakness as mentioned in the evidence."

It is urged that this instruction also assumes controverted facts, viz.: that it assumes negligence; assumes that plaintiff was injured; that his injuries were rendered more difficult or impossible to cure; and that there had been a union of the bones after the prior fracture. Also that the instruction prejudicially comments on a portion of the evidence in referring to said prior fracture.

The instruction clearly does not assume negligence nor that plaintiff was injured. It requires the jury to find those facts, referring to other instructions for the facts constituting negligence. Nor do we think it assumes that the injuries complained of were rendered more difficult or impossible to cure because of a former injury. In effect it tells the jury that even though they may find such to be the fact yet defendant would be liable for the ill effects, if any, resulting from the injury, if any, received on the instant occasion.

In connection with the contention that the instruction assumes that there had been a union of the bones following the former injury it is necessary to state that some six or seven years prior to the injury herein complained of plaintiff had suffered a fracture of the same bone at the same place where it is claimed it was fractured on this occasion. The prior injury was admitted. Plaintiff's evidence tended to prove that he had completely recovered from such prior injury and had a complete bony union of the parts. Defendant's evidence tended to prove that there had been only what the doctors called a fibrous union, or, as some of them termed it, that a "false joint" had formed at the place of fracture. That the parts had been brought and held together either by bone substance or by fibrous tissues and ligaments was shown by evidence on both sides. In hypothetical questions put to its own expert witnesses appellant assumed that there had been a fibrous union. The instruction referred to a "weakness of the union of the bones of plaintiff's right hip" and submitted it to the jury to find "that he had such weakness as mentioned in the evidence." We think the instruction obviously refers to a *weakness* of the union, whatever the character of the union was, rather than to a bony union as distinguished from a fibrous union, and that the jury could not have been confused or misled by it. Defendant requested and was given an instruction, O, telling the jury that the plaintiff must prove that defendant was negligent "as defined in these instructions," that he was injured, and that "such injury, if any, was the direct result of such negligence on the part of such defendant, if any;" also one, Q, directing the jury that if plaintiff had received a prior injury and was still suffering therefrom on January 8, 1929 (the date of the collision) "you cannot allow the plaintiff any sum of money . . . on account of such old injury, if any. . . . If your verdict should

be for the plaintiff, the only sum which you may allow him in your verdict shall be a sum sufficient to compensate him, as set forth in these instructions, for the injury sustained on January 8, 1929, if any.''

We are not favorably impressed with appellant's further contention that Instruction No. 2 unwarrantably comments on a detached portion of the evidence. The instructions on the point now under consideration are substantially the same as those on the same subject given and approved in Kiefer v. City of St. Joseph (Mo.), 243 S. W. 104. We think they fairly presented the law to the jury.

■ Appellant further contends that said instruction broadens the issues made by the pleadings, in that it allows recovery for failure of defendant to use the highest degree of care in any way and does not limit plaintiff's right of recovery to the specific acts of negligence pleaded and proved. This contention seems to be based on the theory that the only definition of negligence or the facts constituting it is the *last paragraph* of plaintiff's Instruction No. 1. In this contention appellant is clearly mistaken. Said Instruction No. 1 is the only instruction that purports to define negligence or state the facts that would constitute it. It states what facts the jury must find in order to convict defendant of negligence and authorize a verdict for plaintiff. The reference in Instruction No. 2 to negligence of defendant "as defined in other instructions" could only refer to the negligence specified in Instruction No. 1, since that was the only one given on that subject, and to the facts therein set forth which, if found, constituted negligence. Defendant itself, in its Instruction O, referred in like manner to negligence "as defined in these instructions." This assignment of error is without merit.

■ Appellant challenges the correctness of plaintiff's Instruction No. 3, which is as follows: "If your verdict should be in favor of the plaintiff, you should assess his damages (if any) at such sum as you believe and find from the evidence to be fair and reasonable compensation for the injuries and disabilities (if any) in question; and in assessing the amount of said damages (if any) you may take into consideration the nature, character, and extent of said injuries and disabilities (if any) as you find to be shown from the evidence.''

The criticism of this instruction is that "it does not limit the amount of recovery for disabilities." Appellant says that " 'Disabilities' as used in this case can only mean the inability, incapacity, unfitness, or disqualification of the plaintiff for carrying on his usual work and earning his usual and ordinary wages.''

Appellant's complaint of this instruction is not clear. Certain cases cited by it such as Smoot v. Kansas City, 194 Mo. 513, 92 S. W. 363, indicate that the complaint may be that the instruction does not limit plaintiff's loss of earnings to the amount claimed in the petition, although the instruction does not mention loss of earn-

ings. Plaintiff in his petition alleged "that he has lost his time and earnings in the sum of fifteen hundred dollars ($1500), and his earning capacity is totally destroyed or permanently injured." Such allegation limited the amount of lost earnings only as to past earnings, that is earnings lost up to the filing of the petition. [See Leingang v. Geller, Ward & Hasner Hardware Co., 335 Mo. 549, 73 S. W. (2d) 256, and cases cited.] The evidence showed a loss of past earnings slightly less in amount than the sum named in the petition. In such situation an instruction which fails to limit the recovery for such item to the sum claimed therefor is not prejudicially erroneous, since the jury will be presumed to have followed the evidence. [Laycock v. United Rys. Co., 290 Mo. 344, 235 S. W. 91; Leingang v. Geller, Ward & Hasner Co., supra.]

If appellant means that the instruction is not sufficiently specific in pointing out the elements of damage to be considered by the jury, not only did it fail to ask a more specific instruction, State ex rel. United Rys. Co. v. Reynolds, 257 Mo. 19, 165 S. W. 729; Wolfe v. Kansas City, 334 Mo. 796, 68 S. W. (2d) 821, but by reference in its own Instruction Q it adopted the direction given the jury by plaintiff's Instruction No. 3 (that being the only other instruction given on the subject) and is in no position to complain that it is not sufficiently specific.

In Cunningham v. Doe Run Lead Co. (Mo.), 26 S. W. (2d) 957, 961, (10), we held a similar instruction sufficient, the defendant not having requested a more specific instruction. This point is ruled against appellant.

In this case the briefs on both sides aggregate nearly four hundred pages. Without further lengthening this already long opinion by reference to and discussion of the many cases cited we may say that in our opinion the case was fairly tried and we find no reversible error in the record.

One point remains to be considered. It is contended that the verdict of $27,500 is excessive. Plaintiff's evidence, to which we must look in determining this contention, tended to show the following: On November 4, 1922, plaintiff had suffered a fracture of the same bone and at the same place where he claims it was fractured, or refractured, on the occasion in question. His evidence tended to show that the prior fracture had completely healed, resulting in a complete bony union of the parts without permanent ill effects to the hip joint and leaving him able to work at and prior to the time of the injury herein complained of efficiently and without discomfort. At the time of the injury complained of he was forty-five years old, regularly employed and earning $28.80 a week. He testified that at the time of receiving this injury he suffered intense pain and has suffered pain continuously since; that the pain and nervousness resulting from the injury prevent him from sleeping—"it breaks

into my nights. Some nights I can sleep and other nights I have to get up, I am in such pain." He cannot maintain a normal sitting posture, being required to support his weight on the left hip because of the great pain caused by resting weight on the right hip, or leg. He is compelled to use crutches in walking, being unable to rest weight on his right foot. There is and has been since the injury a tremor in the entire right leg, which "comes and goes" and over which he has no control,—"at night when I lay down my leg will jerk up." He has been wholly unable to work since his injury. His and the medical testimony in his behalf was to the effect that he was in the hospital seven weeks. At first his hip and leg were immobilized in a Thomas splint. Following that a Whitman plaster abduction cast or splint, designed to hold the leg in extension and away from the body and to hold the ends of the fractured bone together, was used for a time. Subsequently another splint made of steel with joints at the knee was applied and his leg was kept in it until at least as late as August, 1929. There is now no union of the parts and the expert testimony is that there never will be. The right leg is shortened an inch or an inch and a half. The neck of the femur has been destroyed, having become absorbed, and the hip joint has become ankylosed. Plaintiff cannot flex or rotate the right leg. It swings helplessly from the body. There is "a disturbance in the balance and equilibrium of the bones, muscles and nerves." Plaintiff is wholly incapacitated for work. One doctor testified relative to the condition of the right leg that "For activity, for weight bearing—for work or weight bearing it is a one hundred per cent disability." The evidence of plaintiff's experts is that the existing conditions, including the involuntary tremor in the right leg, are permanent; that there is no hope of improvement, and that plaintiff will continue to suffer pain therefrom. Plaintiff's evidence tended to show that the pain and disabilities he now suffers resulted from the injury herein complained of. On the other hand there was considerable expert evidence offered by defendant tending to show that his present condition is the result of the old fracture and that, if he received any substantial injury on the occasion here in question, which defendant's experts were inclined to doubt, such injury did not materially increase the disabilities resulting from the old fracture. On appeal we must of course look to plaintiff's evidence, which is substantial and which the jury had a right to and evidently did believe.

A number of cases are cited on this question. The one nearest in point on the facts is Margulis v. National Enameling & Stamping Co., 324 Mo. 420, 23 S. W. (2d) 1049, in which a verdict for the same amount was approved. The injuries there shown were similar to those shown by plaintiff's evidence in the instant case, possibly not quite as completely disabling as those here shown. But in that

case the plaintiff had lost much more in wages and medical expenses up to the time of the trial than did plaintiff in the instant case. Here the plaintiff had lost in earnings prior to the date of the verdict, May 20, 1931, approximately $3500, counting his earnings at the rate he was paid prior to his injury. The amount of his hospital and surgical bills is not shown.

In Berry v. B. & O. Ry. Co. (Mo.), 43 S. W. (2d) 782, a verdict for $35,000 for injuries somewhat similar but less disabling than those here shown was reduced by this court to $20,000. In view of our prior rulings on the question of the amount of damages allowable for personal injuries we think that the verdict in this case is excessive and that the judgment should not be permitted to stand for more than $22,500. If, therefore, the plaintiff will, within ten days, remit $5000 of the judgment as of the date thereof, the judgment of the circuit court will stand affirmed for $22,500, as of its date; otherwise it is reversed and the cause is remanded.

Divisional opinion adopted as the opinion of the Court en Banc. All concur.